UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                :

LESLIE BAILEY, MARIE THELOT, SARAH     :
RODRIGUEZ, LORRAINE PADRO, DHANASAR  :
RAMAN, as court-appointed            :
guardian for JUDITH BLUMENSOHN, CARMEN  :
DURAN, JOHN EDWARDS, ERNESTA     :
GUTIERREZ, JULIA JUAN, and JANE DOE,   :
individually and on behalf of all others similarly  :
situated,                :    **AMENDED CLASS ACTION**
                :    **COMPLAINT**
        Plaintiffs,      : 
                :    Case No: 11-CV-1788 (CBA)
   v.              :    (RLM)
                :

MICHAEL J. ASTRUE,        :
AS COMMISSIONER OF SOCIAL SECURITY,  :
                :
        Defendant.      :
                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PRELIMINARY STATEMENT

1.     Plaintiffs, on behalf of themselves and all others similarly situated (together

"Class Plaintiffs"), bring this action against the Commissioner of the Social Security

Administration Michael J. Astrue (the "Commissioner"), for bias by the Queens Office of

Disability Adjudication and Review ("QODAR"), resulting in a systematic failure to provide

Social Security disability claimants with full and fair Social Security benefit hearings.

2.     Class Plaintiffs comprise a vulnerable group of disabled individuals with

extremely limited means of subsistence. Many have profound disabilities—the kind of

disabilities, as one court put it, that "dominate life." Notwithstanding clearly documented and

disabling medical conditions, Class Plaintiffs, and thousands like them, have diligently pressed

their rights for years – cataloging their conditions, meeting with doctors, being subjected to innumerable tests and procedures – only to run headlong into the QODAR brick wall of bias.

3.     The treatment of claimants by QODAR is all the more appalling given the well-settled principle that the Social Security Act (the "Act") should be applied in a manner that is inclusive when considering benefits awards – *not* exclusive.  As explained in *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975), the Act is to be "broadly construed and liberally applied."  It is for this reason that when an individual is initially denied benefits they are entitled to a fair non-adversarial hearing before an impartial Administrative Law Judge ("ALJ").

4.     Moreover, in adjudicating a claim for benefits, ALJs must adhere to well-established legal principles intended to further the beneficent purposes of the Act and safeguard the claimant's right to a full, fair, and non-adversarial hearing by, *inter alia*, requiring the ALJ to afford particular weight to the medical opinions of treating physicians and to fully develop the evidentiary record.  Clear and specific guidelines apply to evaluation of a claimant's credibility and subjective symptoms.  ALJs are to adhere to these standards impartially, and to justify their conclusions with evidentiary support.

5.     Rather than the full and fair hearing before an impartial ALJ to which they are entitled, disability claimants who have appeared, and are appearing, before five of QODAR's ALJs – Michael D. "Manuel" Cofresi, Seymour Fier, Marilyn P. Hoppenfeld, Hazel C. Strauss, and Hearing Office Chief David Z. Nisnewitz (together, the "Named ALJs") are systematically deprived of their rights.  These ALJs conduct adversarial hearings, routinely cherry-pick and manipulate facts to support their preordained conclusions, willfully ignore established law, even with explicit instructions from federal district courts and the Social Security Appeals Council,

disregard evidence from treating physicians, engage in bullying and unprofessional behavior, thwart meaningful review of their decisions by deliberately failing to develop the evidentiary record, and effectively hold claimants to a higher evidentiary standard than what is set forth by law.

6.      In short, this is not a case about simple human errors in the review of disability claims.  It is a case about a pattern of deliberate acts engineered to avoid approving meritorious claims and to support pre-ordained, unfavorable decisions.  The acts complained of, and described more fully below, include ignoring well-established law and regulations, selective and misleading use of facts, subverting the weight of the evidence rules, abusing medical expert testimony, and ignoring specific orders of the Appeals Council and federal courts.  Even if, individually, these many legal mistakes, evidentiary failures, refusals to correct errors after remand, and unprofessional conduct constituted only gross incompetence (which itself would still deprive disability claimants of full and fair hearings), the routine and repeated nature of the errors by the Named ALJs, concentrated in the same Social Security office, demonstrate the most inhospitable, unfair and partial environment for claimants when, under the law, "[t]he impartiality of the ALJ is [] integral to the integrity of the system." *Small v. Barnhart*, 329 F. Supp. 2d 1272, 1275 (N.D. Ala. 2004).  When the same ALJ makes the same mistake again and again, let alone when a majority of the ALJs in the same office all make the same mistakes again and again, "it becomes increasingly difficult to ascribe the error to [mistake]," as opposed to generalized bias or incompetence. *See Allenstein v. Barnhart*, 419 F. Supp. 2d 1336, 1338 (N.D. Ala. 2006).

7.      In that regard, many court judgments chronicle these derelictions of duty, and commission of the same errors, in case after case after case.  Courts have used various phrases to describe the problem, highlighted more fully below, with the Named ALJs, including:

      a.     Proceedings that were "**a far cry**" from the required standards;

      b.     Rationale that was "**plucked from thin air**";

      c.     Conduct that "**trivializes plaintiff's impairments**" and "**raises the possibility that the ALJ was not seeking to neutrally develop the record, but rather to find support for the conclusions he had already formed**";

      d.     Analysis that was "**deficient**" and "**incoherent**";

      e.     Decisions that were "**at odds with established precedent**," "**replete with conclusory statements**," "**arbitrary**," "**illogical**," and "**not supported by substantial evidence**";

      f.     Delay that was "**particularly egregious**";

      g.     Witness examinations that were "**a study in combative questioning**";

      h.     "**Threats**" and other conduct that "**exhibited bias and an inappropriate hostility**"; and

      i.     Overall conduct that demonstrates "**serious negligence and could possibly even suggest bias.**"

8.      As discussed below, these criticisms are just a sample.  Many similar criticisms can be found on hundreds of pages of judicial ink devoted to reviewing and remanding the decisions of the Named ALJs discussed below.  Again and again and again, claimants, their advocates, and, finally, judges, have been forced to wade through thousands of pages of

testimony and records only to find the same errors, while claimants lose months and years without the critical benefits they need.

9.      In each case, the victim of the error was not the Commissioner—it was the claimant. Viewed in proper context, these errors transcend mere mistake. They are routine, deliberate, and an obvious manifestation of general bias against claimants.

10.     Even apart from the judicial criticisms, the statistics are striking. QODAR has the *third highest benefits-denial rate in the entire country*, and *almost all of the ALJs below rank high on the national list of top claims deniers*. Between 2005 and 2008, QODAR denied approximately 49% of benefits applications. In contrast, the denial rate for the Brooklyn ODAR (the neighboring borough with a similar disability claimant population and also in the Eastern District of New York) was 19%.

11.     On appeal, the QODAR suffers from one of the highest remand rates in the country. Of the 72 cases in which the Named ALJs were identified by this Court and the District Court for the Southern District of New York in written opinions between January 2008 and the present, the Named ALJs' decisions were remanded because of errors in approximately 80% of those cases.

12.     In particular, the Named ALJs demonstrate persistent and flagrant bias against benefits claimants, as evidenced by their persistent legal and procedural errors, as well as adversarial and unprofessional behavior and disregard of court-imposed rules.

13.     Indeed, the presence of five biased ALJs in a single office – including its Chief ALJ – subjects all disabled claimants from Queens to a unique peril: the very real and substantial likelihood that their cases will be assigned to an ALJ who routinely ignores legal rules, fails to develop the record as required by law, makes unfair and improper adverse

credibility determinations, fails to follow instructions from the Appeals Council and federal courts and engages in adversarial and unprofessional behavior.  Either separately or in the aggregate, these acts deprive claimants of their right to a full and fair hearing in violation of federal law and the Unites States Constitution.

14.     Accordingly, Class Plaintiffs seek a declaratory judgment that the Named ALJs:

a.     Routinely fail to develop administrative records in dereliction of their duties;

b.     Routinely refuse to apply correct legal standards even when instructed by federal courts or the Appeals Council to do so;

c.     Routinely make erroneous credibility determinations against claimants, including by failing to consider claimants' work histories;

d.     Routinely engage in adversarial, unprofessional, and/or unfair behavior to the detriment of claimants;

e.     Routinely demonstrate conduct evincing general bias toward disability claimants; and

f.     Taken together, these consistent actions deprive Class Plaintiffs and other claimants of their rights to fair hearings before an impartial adjudicator, in violation of the Social Security Act, the Administrative Procedure Act, and the due process guarantee of the Fifth Amendment to the United States Constitution.

15.     Plaintiffs also seek an injunction barring the Commissioner from allowing the Named ALJs to preside over any claims for Social Security disability benefits ("SSD") under Title II of the Act, 42 U.S.C. § 401 *et seq.*, and Supplemental Security Income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*

**JURISDICTION**

16.     This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c), 28 U.S.C.

§§ 1331 and 1361, and the Due Process Clause of the Fifth Amendment to the United States

Constitution.  Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and

Rule 57 of the Federal Rules of Civil Procedure, and injunctive relief pursuant to Rule 65 of the

Federal Rules of Civil Procedure.

17.     Venue lies within this district pursuant to 28 U.S.C. § 1391(b)(1) and (2).

**PARTIES**

18.     Plaintiff Leslie Bailey is a resident of Springfield Gardens, New York, and a

claimant for SSD.  Ms. Bailey's case is assigned to the Honorable Dora L. Irizarry, District

Judge, U.S. District Court for the Eastern District of New York, 10-CV-0865.

19.     Plaintiff Marie Thelot is a resident of Jamaica, New York, and a claimant for

SSD benefits.  Ms. Thelot's case is pending before the Appeals Council.

20.     Plaintiff Sarah Rodriguez is a resident of Long Island City, New York, and a

claimant for SSD and SSI.  Ms. Rodriguez's case is scheduled for a hearing on July 11, 2011

before ALJ Cofresi.

21.     Plaintiff Lorraine Padro is a resident of Ozone Park, New York, and a claimant

for SSI.  Ms. Padro's case is assigned to the Honorable Nicholas G. Garaufis, District Judge,

U.S. District Court for the Eastern District of New York, 10-CV-3387.

22.     Plaintiff Toby Marlow is a party to this lawsuit as the court-appointed guardian

for Judith Blumensohn.  Both Ms. Marlow and Ms. Blumensohn are residents of Queens, New

York, and Ms. Blumensohn is a claimant for SSD.  Ms. Blumensohn's case is assigned to the

Honorable Sandra L. Townes, District Judge, U.S. District Court for the Eastern District of New York, 11-CV-00860.

23.     Plaintiff John Edwards is a resident of Brooklyn, New York, and a claimant for SSI.  Mr. Edwards's case is assigned to the Honorable Kiyo A. Matsumoto, District Judge, U.S. District Court for the Eastern District of New York, 11-CV-00971.

24.     Plaintiff Jane Doe is a resident of Far Rockaway, New York, and a claimant for SSI.  Jane Doe's case is pending before the Appeals Council.

25.     Plaintiff Carmen Duran is a resident of Richmond Hill, New York, and a claimant for SSI.  Ms. Duran's case is pending before the Appeals Council.

26.     Plaintiff Ernesta Gutierrez is a resident of Sunnyside, New York, and a claimant for SSI.  Ms. Gutierrez is preparing to file her case in the U.S. District Court for the Eastern District of New York.

27.     Plaintiff Julia Juan is a resident of Elmhurst, New York, and a claimant for SSD and SSI.  Ms. Juan's case is pending before the Appeals Council.

28.     Plaintiff Dhanasar Raman is a resident of South Ozone Park, New York, and a claimant for SSD and SSI.  Mr. Raman's case is pending before the Appeals Council.

29.     Defendant Michael J. Astrue is the Commissioner of the Social Security Administration ("SSA") and is statutorily responsible for the administration of the Act.  SSA employs a corps of ALJs to adjudicate claims under the Act by claimants who request hearings. The SSA established the Office of the Chief Administrative Law Judge which oversees the hearing process conducted by SSA's ALJs; formulates and develops broad policies and objectives and establishes program goals for the ALJs; engages in continuous examination of all aspects of the Office of Disability Adjudication and Review ("ODAR") operations and

implements improvements where needed; is responsible for developing and maintaining procedures for effective operations of the hearings; provides management oversight for all managerial activities in ODAR field offices; and coordinates regional and hearing office activities.

## CLASS ACTION ALLEGATIONS

30.    The named plaintiffs bring their claims on behalf of themselves and other similarly situated persons, pursuant to Federal Rules of Civil Procedure ("FRCP") 23(a) and (b)(2).

31.    The class consists of all claimants whose claims have been or will be assigned to the Named ALJs for a hearing and/or decision and all SSI and SSD claimants who, since January 1, 2005, have received an unfavorable or partially favorable decision, not reversed on any subsequent appeal, from the Named ALJs.

32.    The class action requirements of FRCP 23(a) and (b)(2) are met in that:

a.    The class is so numerous that joinder of all members is impracticable. Upon information and belief, the Named ALJs each conduct over 150 hearings a year and deny benefits to up to 77% of claimants who appear before them. Every individual eligible for a hearing before the Named ALJs is a potential class member.

b.    There are questions of law and fact common to the class, including whether the Named ALJs are generally biased against claimants for SSI and SSD and whether this bias deprives Class Plaintiffs of their right to a full and fair hearing before an impartial adjudicator, in violation of the Act, the Administrative Procedure Act, and the Due Process Clause of the Fifth Amendment.

c.      The named plaintiffs' claims are typical of the claims of the class, and the named plaintiffs have no conflict of interest with other members of the class, all of whom would benefit from the relief sought in this case.

d.      The named plaintiffs will fairly and adequately represent the interests of the class.  Plaintiffs are represented by counsel experienced in class action litigation, and in litigating cases involving the SSA as well as other public benefit programs.  Counsel has previously litigated numerous class action suits in federal court and has sufficient resources to prosecute the present case.

e.      The Commissioner has acted on grounds generally applicable to the class by allowing plaintiffs' claims to be assigned to the Named ALJs despite their bias and inability or unwillingness to provide fair hearings.  If class certification is not granted, individuals would be forced to bring separate actions, thereby wasting judicial resources, as well as the time of attorneys from government agencies and free legal services programs.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

**A.      Applying for Social Security Benefits**

33.      The Commissioner administers several types of benefits under the Act, including benefits based on disability or old age.  A disabled person can apply for two distinct forms of disability benefits administered by SSA: SSD, which is based on work history, and SSI, which is based on limited income and resources.  Some individuals are eligible for both SSI and SSD.

34.      A disabled individual may be eligible for SSD based on his or her work history, or the work history of a parent or spouse.  A wage-earner claimant for SSD must prove disability as of the date the worker was last insured.

35.     An individual may be eligible for SSD as a disabled adult child ("DAC") if he or she became disabled prior to age 22 and has an insured parent who is receiving Social Security benefits or is deceased.

36.     An adult individual can be found to be "disabled" for purposes of SSI and SSD if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

37.     An adult individual is found to be disabled if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

38.     The evaluation of medical disability for both SSI and SSD is the same and consists of a "five-step sequential evaluation" codified by SSA.  20 C.F.R. §§ 416.920, 404.1520.

39.     The first step of the sequential evaluation determines whether the claimant is engaged in "substantial gainful activity."

40.     If the claimant is not engaged in such activity, the severity of the claimant's impairment is evaluated in the second step.  An impairment is defined as "severe" if it interferes with basic work-related activities and is expected to result in death or last more than twelve months.

41.     If the impairment is found to be severe, the claimant's impairments are evaluated against the Listing of Impairments ("Listing") contained in SSA's regulations.  20 C.F.R. Pt. 404 Subpt. P., App. 1; 20 C.F.R. §§ 416.920(d), 404.1520(d).  The Listing sets forth a set of symptoms and other criteria specific to several medical conditions.  A claimant can "meet" the Listing and be found disabled with medical evidence that supports the exact requirements of the Listing or "equals" a Listing.

42.     If the claimant's impairment does not meet or equal a Listing, the process moves to the fourth step, with a determination of the claimant's "residual functional capacity."  This finding assesses the claimant's capacity to engage in basic work activities, including prior relevant work.

43.     If the claimant does not retain the residual functional capacity to return to prior relevant work, the process moves to the fifth step, where a determination is made regarding whether the claimant has the capacity to perform other work in the national economy in light of the claimant's residual functional capacity assessment, age, education, and work experience.  If the claimant cannot perform other work, benefits are awarded.  The burden of proof at this step is on the Commissioner.

44.     Applications for SSI and SSD are initially processed through a network of SSA field offices and state disability determination services.  A claimant begins the process by completing an application and an adult disability report, and submitting the documents to one of SSA's field offices.  In New York, the initial determination of whether a claimant is disabled is made by New York State's Office of Temporary and Disability Assistance ("OTDA"), pursuant to a contract with SSA.  At this stage, OTDA may order a consultative examination of the claimant.

45.     If the claim is denied, that claimant is entitled to a hearing before an ALJ in SSA's ODAR.  The ALJ reviews the claim *de novo*.  This is the claimant's **only** opportunity to make his or her case in person.

46.     ALJ hearings are informal and non-adversarial proceedings.  The claimant may have an attorney or non-attorney act as his or her representative at the hearing.

47.     If the ALJ's decision is adverse to the claimant, he or she may seek review by the Appeals Council, a component of SSA's ODAR.  The Appeals Council has the power to deny the request for review, accept the case for review and deny or grant benefits, or accept the case for review and remand it to an ALJ for further review.  The Appeals Council has the power to review an ALJ's decision *sua sponte* within 60 days of the decision.

48.     On information and belief, the average processing time for the Appeals Council to review a case and issue a decision is fourteen months.

49.     If the claimant disagrees with the Appeals Council's decision or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court pursuant to 42 U.S.C. §§ 405(g), 1383(c).  If a federal court remands the claim, it goes to the Appeals Council, which may grant benefits or remand the case to an ALJ with instructions.  If a denial from the same ALJ is remanded more than twice, it is the policy and practice of the Appeals Council to remand to a different ALJ.  A federal court and the Appeals Council can remand to a different ALJ at any time.

50.     SSI and SSD claimants are often unrepresented by counsel due to a lack of financial means and/or sufficient information to understand the importance of retaining an attorney.  In addition, SSI and SSD claimants often have mild or severe mental disabilities.

Many also have limited means of transportation to disability interviews, meetings, and hearings. Denial of claims can and does have severe consequences for claimants and their families.

**B.    The Named ALJs Flout The Established Non-Adversarial and Beneficent Process Afforded to Social Security Claimants**

51.    The Second Circuit, in *Haberman v. Finch*, 418 F.2d 664, 667 (2d Cir. 1969), explained that "this statute [the Social Security Act], more than most, was intended to aid beneficiaries rather than ease the lot of administrators," and accordingly "to be broadly construed and liberally applied."  It further clarified the proper interpretation of the statute when it held:  the Act is "a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion." *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983).

52.    It follows that Social Security hearings are to be inquisitorial *rather than* adversarial, in order to further the beneficent purpose of the Act.  Indeed, the Supreme Court explained in *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000), that Social Security hearings are to be "non-adversarial [in] nature" and ALJs have a duty to develop facts and arguments both for and against the granting of benefits.

53.    In order to properly carry out their obligations, it is vitally important that the ALJs are professional, fair, competent and impartial.  This is particularly true in a legal environment where many claimants are unrepresented by counsel and may not understand how to properly present their claim or appeal an unfair denial.  The Named ALJs flagrantly and routinely violate these principles of the Act and instead, bully the claimants who appear before them through their consistently adversarial conduct, which further discourages claimants from pursuing valid appeals.  Even determined claimants who choose to pursue valid appeals may not receive relief for many months or even years.

54.    Well-settled legal principles intended to further the beneficent purpose of the Act and safeguard the claimant's right to a full, fair, and non-adversarial hearing require the ALJ to afford particular weight to the medical opinions of treating physicians and to fully develop the record with substantial evidence if those opinions are discounted.  Clear and specific guidelines apply to the evaluation of a claimant's credibility and subjective symptoms.  ALJs are to apply these legal standards impartially, justify their conclusions with evidentiary support, and have a duty to seek additional evidence *sua sponte* when the record is insufficient.

55.    In Queens, the Named ALJs are systematically violating these core principles and depriving disability claimants of the right to a fair and impartial non-adversarial hearing. The Named ALJs reject their duty to act as fair inquisitors who liberally apply the Act, and their conduct clearly evinces a general bias against awarding benefits, and/or gross incompetence, either of which deprive claimants of their rights to full and fair hearings.

56.    The bias of the Named ALJs is evident during every component of the hearing process, but is often made most clear through the consistently adversarial and unprofessional tone of the hearings they conduct.  In their decisions, the Named ALJs ignore their affirmative duty to develop a full record and instead routinely cherry-pick and manipulate facts to support their preordained conclusions; they routinely disregard well-established law by discounting the opinions of treating physicians in favor of their own opinions and the opinions of physicians who have examined the claimant either briefly or not at all; they disregard explicit rules governing the evaluation of claimant credibility and analysis of subjective symptoms; they fail to justify their conclusions with substantial evidence as required by law; they ignore specific instructions from district courts and the Appeals Council reversing denials of benefits; and they hold claimants to a higher standard of evidence than is permissible by law.

57.     The Named ALJs engage in this conduct despite the "axiomatic [principle] that 'trial before an unbiased judge is essential for due process.'" *Johnson v. Mississippi.*, 403 U.S. 212, 216 (1971) (petitioner's due process rights violated by judge's bias).  Furthermore, an even "stricter application" of the impartiality requirement applies in the administrative context, where there is an "absence … of procedural safeguards normally available in judicial proceedings . . ." *Hummel v. Heckler*, 736 F.2d 91, 93 (3d Cir. 1984) (Social Security benefits claimant entitled to unbiased adjudicator).

58.     To date, the only known discipline taken against the Named ALJs is by district court judges who have offered harsh criticism in response to the errors they have committed.  But because these errors are a product of a generalized bias against claimants for disability benefits, the Named ALJs continue to repeat them over and over again.  The Commissioner has done nothing to remedy the gross incompetence or generalized bias of the Named ALJs, or the resulting systematic denial of full and fair hearings.

**C.     Seminal Principles of Social Security Law**

59.     The chronic failure of the Named ALJs to correctly apply the law is all the more alarming given the well-settled principles that govern the components of an SSA benefits determination.  Indeed, as evidenced below, the Second Circuit has clearly opined on the standards to be applied and provided the Named ALJs with a roadmap for the correct adjudication of benefits applications.

**1.     Evidentiary Standard**

60.     It is the long-standing policy of the Commissioner to apply the preponderance of evidence standard, the traditional evidentiary standard in civil or administrative adjudicatory

proceedings. This standard of proof applies at all levels of administrative review, but the Named ALJs effectively, and wrongfully, have held Class Plaintiffs to a much higher standard.

**2.    Treating Physician Rule**

61.    In determining the nature, scope and effect of a disability, an ALJ is required to follow the "Treating Physician Rule." Originally articulated by Courts of Appeals, and later codified by SSA, 20 C.F.R. §§ 416.927(d)(2), 404.1527(d)(2), the Treating Physician Rule was intended as a means to control rampant denials of SSI and SSD claims.

62.    Based on the notion that the claimant's treating physician (as opposed to non-treating physicians, typically retained by OTDA and SSA for one-time consultative examinations, and non-examining physicians used to review claims files without ever meeting the claimant) are in a better position to render a reliable diagnosis and prognosis based on the deeper knowledge and insight gained from the physician's longitudinal treatment of the claimant, the Treating Physician Rule requires the decision-maker to give special deference to the treating physician in cases where the medical evidence is in conflict. The application of the Treating Physician Rule is the single-most important determinant in weighing SSI and SSD claims.

63.    For example, in *Schisler v. Heckler*, 787 F.2d 76, 81 (2d Cir. 1986), the seminal case on the interpretation of the Treating Physician Rule, the Second Circuit held:

> The treating-physician rule governs the weight to be accorded the medical opinion of the physician who treated the claimant . . . relative to other medical evidence before the fact-finder, including opinions of other physicians. The rule, which has been the law of this circuit for at least five years, provides that a treating physician's opinion on the subject of medical disability, i.e., diagnosis and nature and degree of impairment, is: (i) binding on the fact-finder unless contradicted by substantial evidence; and (ii) entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than are other physicians, although resolution of genuine conflicts

between the opinion of the treating physician, with its extra weight, and any substantial evidence to the contrary remains the responsibility of the fact-finder.

64.     The Second Circuit further honed this directive in *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999), where it held that the opinion of a treating physician must in fact be given controlling weight if it is well supported by medical finding and not inconsistent with other substantial evidence.  The Court held further that ALJs "cannot arbitrarily substitute [their] own judgment for competent medical opinion" and that it is improper for an ALJ to "'set [her] own expertise against that of' the treating physician."

65.     Yet despite this bright-line test, and as evidenced in detail below, the Named ALJs routinely misapply the Treating Physician Rule—a critical component of the eligibility analysis.  Their misconduct ranges from entirely ignoring the treating physician to finding obvious pretexts for marginalizing his or her medical opinion.  Often, the Named ALJs engage in this illegal behavior because the treating physician's evidence contradicts a conclusion the Named ALJ has already reached.

### 3.     Analysis of Subjective Symptoms

66.     Equally critical to the adjudication of a benefits claim under the Act is the proper analysis of subjective symptoms, including pain.  The Second Circuit instructs that claims of pain and functional limitation need not be supported by objective medical evidence.  *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003).  Indeed, the Second Circuit cites favorably to the Eighth Circuit's pronouncement that "[a] patient's reports of complaints, or history, is an essential diagnostic tool." *Id.* (citing *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)).  Moreover, "[a]s a general matter, 'objective' findings are not required in order to find that an applicant is disabled." *Id.* at 108.  Sadly, the record demonstrates that the Named ALJs do not properly assess subjective symptoms.  Instead, they readily ignore directives to

consider these important components of a claimant's disability, and routinely marginalize any such testimony or evidence if it is not consistent with the conclusion that, in many cases, the Named ALJs have pre-ordained.

67.     Moreover, in assessing the degree to which a claimant's pain interferes with his or her ability to work, an ALJ's ability to disregard the claimant's testimony about such pain is strictly limited.  Once a claimant is determined to have a pain-producing disability, the ALJ may not disregard her testimony about the scope of, and limitations created by, such pain.  20 C.F.R. § 404.1529(c)(2)-(3).  Rather, the ALJ must consider seven factors in evaluating a claimant's testimony concerning pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) any treatment, other than medication that the claimant received; (6) any measures the claimant uses to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i). Nevertheless, the Named ALJs regularly downplay pain as a factor.

**4.     Claimant Credibility**

68.     The ALJs' failure to correctly consider subjective complaints is often manifest in improper credibility determinations.

69.     The proper assessment of a claimant's credibility is of vital importance in determining whether an individual qualifies for benefits.  Accordingly, the Commissioner and the Second Circuit have both issued explicit guidance that an ALJ must adhere to in adjudicating benefits claims.  In guidance to all ALJs, the Commissioner specifically instructed:

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *2 (S.S.A.).

70.     The Second Circuit has additionally clarified that in assessing credibility, "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983).

71.     Once again, despite having been provided with a clear set of guidelines for assessing credibility, the record demonstrates that the Named ALJs operate as if there are no guidelines at all. Routinely, the Named ALJs disregard the factual evidence in the record and substitute their own opinions in place of a claimant's testimony. Additionally, in multiple instances, the Named ALJs failed to accord the appropriate weight to a claimant's previous work experience as a positive credibility factor.

**5.     Duty to Develop the Record**

72.     Whether or not a claimant has counsel, and often they do not, an ALJ is required to develop the evidentiary record pursuant to 20 C.F.R. §§ 416.912(d), 404.944, and 404.1512(d), and seek additional information from the treating physician. The Court of Appeals for the Second Circuit has held that an ALJ has an affirmative duty to develop the administrative record and that it is the duty of an ALJ to seek additional information from the treating physician *sua sponte* where clinical findings are inadequate. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). This duty includes the responsibility to investigate and develop evidence and arguments in favor of and against awarding benefits, which is heightened

when the claimant is unrepresented. *Echevarria v. Secretary of Health & Human Svcs.*, 685 F.2d 751, 755 (2d Cir. 1982).

73.     The Named ALJs consistently and chronically fail to satisfy their obligation to create the proper record in order to avoid favorable determinations.

### 6.     Use of a Vocational Expert

74.     The Second Circuit has also provided instructions governing the proper implementation of a vocational expert to supplement the use of medical-vocational guidelines in assessing a claimant's ability to perform work.  In *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986), the Second Circuit held:

> [A]pplication of the grid guidelines and the necessity for expert testimony must be determined on a case-by-case basis.  If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate. But if a claimant's nonexertional impairments "significantly limit the range of work permitted by his exertional limitations" then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments.

75.     The Second Circuit, through its decision in *Bapp*, established a test that hinges the need for a vocational expert upon the non-exertional impairments of the claimant.  Yet despite this clear directive, and as evidenced repeatedly below, the Named ALJs fail time and time again to properly utilize vocational experts, and instead thrust their own biased opinions into the evaluation of non-exertional impairments to the great detriment of the claimants.

### 7.     Use of Medical Experts

76.     ALJs are authorized to seek the opinions of Medical Experts ("ME") when they need assistance in interpreting a claimant's medical file.  MEs do not examine claimants, and are typically called to testify at the hearing.  Their sole purpose is to provide an impartial interpretation of a claimant's medical file so that the ALJ can better understand the claimant's condition.  To ensure an ME's impartiality, the SSA's own internal guidelines require that ALJs

select MEs from a roster maintained by each regional office.  Once an ALJ selects an expert

from the list, "that ME will go to the bottom of the roster and will not be called again by that

ALJ or any other ALJ in the [Hearing Office] until all other MEs on the roster with that medical

specialty are called."  Hearings, Appeals and Litigation Law Manual (HALLEX) I-2-5-36 D.

77.     The Named ALJs use MEs in a disproportionate number of cases and routinely

favor their opinions over the opinions of a claimant's treating physician.  Moreover, the Named

ALJs, in violation of the SSA's own instructions, habitually select a small number of MEs

whom they know will interpret a claimant's file to find the claimant not disabled or will respond

to the ALJ's suggestions and influence.  The Named ALJs also routinely ask leading questions

of the MEs in order to elicit testimony that will support the denial of benefits.  By favoring the

opinions of MEs over treating sources and by selecting biased MEs, the Named ALJs are able to

introduce their own biased opinions into the record to support their predetermined decisions to

deny benefits.

\*        \*        \*

78.     The practical effect of the Named ALJs' failure to follow these long-standing

and clear principles is a miscarriage of justice and a deprivation of the class plaintiffs' statutory

and constitutional rights.  The manifest errors cause claimants to spend years, and sometimes

more than a decade, being shuttled back and forth within the multi-layered bureaucracy.

Tellingly, several of the rulings made by this Court and discussed herein, reflect the district

court judges' frustration with the Named ALJs for repeating the exact same mistakes in the

exact same manner over and over again.  Based on their complete lack of faith in the Named

ALJs' ability to carry out their mandate, in many instances the cases at issue are either

remanded to different ALJs or remanded solely for a benefits calculation.

**D.      The Queens Office Of Disability Adjudication & Review**

79.      According to the hiring standards set forth by the U.S. Office of Personnel Management, "ALJs serve as independent impartial triers of fact in formal proceedings requiring a decision on the record after the opportunity for a hearing." The Association of Administrative Law Judges, representing ALJs employed by the Commissioner, has noted that "the administrative law judges in [SSA] have the responsibilities of developing a complete record for both parties; to protect the trust fund as well as the due process rights of the claimant; and render a legally defensible decision based on the evidence in the hearing record."

80.      The Commissioner employs ALJs, pursuant to 5 U.S.C. § 3105, to adjudicate claims for benefits under the Act in Queens, New York, and assigns them to various hearing offices. There are currently eight ALJs assigned to QODAR, including QODAR's Chief ALJ Nisnewitz, and ALJs Cofresi, Fier, Hoppenfeld, and Strauss.

81.      The Named ALJs are not fair adjudicators; they each have a general bias against SSA claimants and use any means available, legal or not, to prevent claimants from having fair hearings before an impartial decision maker, and to deny valid claims.

82.      The bias of the Named ALJs is described in four sections below:

a.      **Section 1** reviews the history of bias of each Named ALJ based on published and unpublished judicial decisions.

b.      **Section 2** discusses the Commissioner's indifference, and failure to act, in response to this pattern and practice of gross misconduct, which made this lawsuit (and the relief sought by plaintiffs) the last resort.

c.      **Section 3** addresses the lack of public accountability for ALJs.

d.   **Section 4** addresses the specific mistreatment of plaintiffs and class members by the Named ALJs.

1.   **History of Bias**

83.   The Named ALJs each have a clear and unambiguous history of bias against SSI and SSD claimants.  Their disturbing pattern of conduct, which the Commissioner has failed to address or remediate, is demonstrated conclusively by their: (1) routine failure to develop the administrative record; (2) routine failure to follow the law; (3) erroneous and faulty credibility determinations; and (4) aberrantly high denial rates.  Each category of misconduct is described below for each ALJ.

a)   **Chief ALJ David Z. Nisnewitz**

84.   Since January 1, 2008, thirteen district court cases identified ALJ Nisnewitz as the author of the decision under review.  In these federal court opinions he was found to have committed error in ten cases.  There is little doubt, when the overall record is considered, that Chief ALJ Nisnewitz's consistent errors are highly probative of his anti-claimant bias.

85.   Chief ALJ Nisnewitz routinely holds hearings that are combative, adversarial, and intimidating for claimants.  He routinely prevents attorneys from stating objections on the record, and instructs witnesses to re-state their testimony.  This conduct is designed to manipulate the record in order to justify his preordained conclusion that benefits claims should be denied.  By behaving in this manner, Chief ALJ Nisnewitz sets a toxic example for the other Named ALJs of QODAR.

86.   As demonstrated below, Chief ALJ Nisnewitz regularly distorts the evidentiary record and ignores well-settled law, particularly the Treating Physician Rule, in order to reach predetermined results, setting a tone that the other Named ALJs in QODAR have embraced.

87.     Taken together, this conduct demonstrates a clear and convincing pattern of general bias against the award of benefits to deserving claimants.

### (1)     Failure to Develop the Record

88.     In a vast majority of ALJ Nisnewitz's cases, this Court found him in error for failing to discharge his duty to "affirmatively develop the record." The Courts' factual findings are wholly consistent with a clear pattern of denial of meritorious claims based on pre-existing bias against claimants for disability benefits. Below are several notable examples, demonstrating this clear pattern between 2008 and the present:[1]

89.     In *Ginsberg v. Astrue*, 2008 WL 3876067 (E.D.N.Y. Aug. 18, 2008), ALJ Nisnewitz denied benefits to a 55-year-old *pro se* claimant who suffered from multiple chronic conditions and experienced extended periods of being completely bedridden. This Court found that ALJ Nisnewitz made numerous errors and was unfair. Noting that "the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," the Court found him in dereliction of his duty. For example:

a.      Rather than calling witnesses to develop the record, ALJ Nisnewitz callously stated, "I don't make calls."

b.      ALJ Nisnewitz's response to a *pro se* claimant's social worker's request for guidance on how to establish a doctor's expertise was "intemperate, brusque, and unhelpful."

---

[1] In *Kendrick v. Sullivan*, 784 F. Supp. 94 (S.D.N.Y. 1992), the United States District Court for the Southern District of New York relied on a prior decision of the court in evaluating plaintiffs' claims of bias and incompetence: "[T]he numerous sharply worded criticisms coming from federal judges and magistrate judges contained in the decisions discussed above are quite serious and highly disturbing to this Court." *Id.* at 103. The court concluded that "plaintiffs have adequately alleged that [the ALJ's] conduct deprived disability claimants of their right to a fair and impartial hearing." *Id.*

c.      ALJ Nisnewitz's questioning of another medical expert was, according to the Court, "a study in combative questioning, which hampered the truth seeking process."

d.      ALJ Nisnewitz constantly interrupted a medical expert's testimony with leading questions designed "to elicit the responses he apparently wanted or expected to hear."

e.      His manner of conduct chilled the *pro se* claimant's social worker during the Commissioner's case, resulting in "virtually no cross-examination at all."

f.      Based on these errors, the Court found that ALJ Nisnewitz was "a far cry" away from satisfying his duty to develop the record.  Thus, the Court vacated and remanded.

90.      In *Rudt-Pohl v. Astrue*, 2009 WL 2611320 (E.D.N.Y. Aug. 25, 2009), ALJ Nisnewitz twice denied benefits to claimant and was found both times to have failed to properly develop the record.  This Court found that "[claimant] has a very serious medical condition [an allergy] that clearly dominates her life."  In fact, claimant's allergy was so severe that she had an acute allergic reaction in front of ALJ Nisnewitz, forcing her to attend the adjourned hearing telephonically.  Ignoring the evidence, ALJ Nisnewitz found that claimant could hold a job and denied her benefits claim, a decision this Court held was based on no proof at all.  For these reasons, the Court found that the "ALJ's conclusion cannot be sustained on the record before this Court," vacated his decision, and remanded the matter solely for the calculation of benefits.

91.      In *Larkins v. Astrue*, 2009 WL 3148763 (E.D.N.Y. Sept. 29, 2009), ALJ Nisnewitz had denied benefits to a claimant with multiple sclerosis, who had an impressive 30-year work history.  Thereafter, the Second Circuit Court of Appeals remanded the claim for ALJ Nisnewitz's failure to develop the record, including by failing to resolve inconsistencies in the medical testimony.  In addition to legal errors (discussed below), this Court found that ALJ

Nisnewitz failed again to develop the record. "Here," the Court explained, "over the course of twelve years, the record has been developed and reviewed by the ALJ, twice." Nevertheless, the Court found that ALJ Nisnewitz's determination was "not supported by substantial evidence." The Court further found that, "[a]lthough the Court of Appeals for the Second Circuit instructed the ALJ to resolve the apparent tension [between two physicians], the ALJ failed to do so." Rather than acceding to the Commissioner's request for further remand for additional proceedings, the Court made a finding of disability and remanded solely for the calculation of benefits.

92.     In *Baldwin v. Astrue*, 2009 WL 4931363 (S.D.N.Y. Dec. 21, 2009), this Court again found that ALJ Nisnewitz "neglected his duty to properly develop the record," stating that he failed to consider "the incompleteness of the record before him" in making his adverse benefits decision, and that he "failed to meet his responsibility to resolve ambiguities or evidentiary gaps in the record." The Court remanded, further finding that ALJ Nisnewitz's "failure to acknowledge relevant evidence or to explain its implicit rejection is plain error."

93.     In *Gross v. Astrue*, 2010 WL 301945 (E.D.N.Y. Jan. 15, 2010), this Court went even farther, finding that ALJ Nisnewitz's behavior "raises the possibility that the ALJ was not seeking neutrally to develop the record, but rather to find support for the conclusions he had already formed in his first decision." ALJ Nisnewitz had denied benefits, twice, to a claimant suffering from severe conditions, including congenital hip dysplasia and associated osteoarthritis. Among other errors, ALJ Nisnewitz again "failed to develop the medical record, failed to consider the proper factors in evaluating [claimant's] claims of subjective pain, and failed to provide a function-by-function assessment of [claimant's] ability to do work-related activities." Using an unusual remedy, but one used all too often for the Named ALJs, the Court

ordered the Commissioner to assign the case to a different ALJ on remand.  In doing so, the Court concluded that ALJ Nisnewitz's conduct suggested a lack of impartiality and a dereliction of his duties.

94.     In *Aas v. Astrue*, 2010 WL 3924687 (E.D.N.Y. Sept. 29, 2010), ALJ Nisnewitz denied benefits to a former New York City firefighter with severe medical conditions, including spinal disk degeneration, depression, and associated alcoholism.  This Court found that ALJ Nisnewitz had denied benefits without developing and evaluating all available evidence. Indeed, ALJ Nisnewitz erred, according to the Court, in rejecting the claim without even considering claimant's non-exertional limitations.  ALJ Nisnewitz failed to seek any evidence on this important issue.

95.     In *Legare v. Comm'r of Soc. Sec.*, 2010 WL 5390958 (E.D.N.Y. Dec. 22, 2010), this Court excoriated ALJ Nisnewitz, stating that his determination of claimant's income eligibility and his analysis "were so deficient and so incoherent as to prevent meaningful review of his decision."  The Court called ALJ Nisnewitz's phrasing "opaque and nonspecific," and found his decision "so palpably deficient" that it ordered a remand.  Convinced that ALJ Nisnewitz could not fairly develop the record, the Court ordered the Commissioner to assign the matter to a different ALJ.

96.     In *Smith v. Astrue*, 2011 WL 1253233 (E.D.N.Y. Mar. 31, 2011), this Court found that ALJ Nisnewitz "failed to develop the record enough to show that his decision was supported by substantial evidence."  ALJ Nisnewitz neglected to obtain records from claimant's actual treating physician prior to 2006, disregarded the treating physician's diagnosis of osteoarthritis, and discounted claimant's complaints regarding her severe impairment because the incomplete records reflected the diagnosis "on only one occasion."  The Court emphasized

that not only is there "no rule requiring a claimant's impairments to be diagnosed more than once," but ALJ Nisnewitz "should have examined the physician's treatment records and addressed any remaining questions or doubts to that physician."  The Court held that ALJ Nisnewitz's failure to properly develop the record required remand.

### (2)   Failure to Follow the Law

97.    In a clear majority of ALJ Nisnewitz's cases, this Court found error for failing to follow the law, including by repeatedly ignoring the Treating Physician Rule.  Below are several notable examples, demonstrating a clear pattern from 2008 through the present:

98.    In *Ginsberg v. Astrue*, 2008 WL 3876067 (E.D.N.Y. Aug. 18, 2008), this Court remanded ALJ Nisnewitz's denial for, among other errors, failing to follow the Treating Physician Rule.  ALJ Nisnewitz erroneously gave little weight to two physicians' findings.  The Court found further error because ALJ Nisnewitz relied, instead, on a non-treating physician, who only reviewed claimant's medical records.  Further, the Court found objectionable ALJ Nisnewitz's decision to interrupt and curtail claimant's social worker's cross-examination of that non-treating physician.  Citing other "inexplicabl[e]" errors, the Court also decried ALJ Nisnewitz's reliance on a previously discredited orthopedist as a basis for denying benefits, ignoring the Court's prior determination that the orthopedist's "slipshod and specious" analysis thwarted "the ability of legitimately disabled individuals . . . to receive the much-needed compensation to which they are entitled."

99.    In *Rudt-Pohl v. Astrue*, 2009 WL 2611320 (E.D.N.Y. Aug. 25, 2009), ALJ Nisnewitz denied benefits to a 65-year-old former nurse.  This Court found that, among other maladies, claimant suffered from a "quite critical" allergy, which resulted in an attack in front of ALJ Nisnewitz and the Commissioner's own medical expert.  Based on that attack, the

Commissioner's own expert conceded the allergy was "significant," and further found that claimant's allergy "threatens her life on a 'moment to moment basis' and 'can occur at any time without any warning, and without being aware of the noxious agent that precipitates the attack.'"  The Commissioner's own expert further testified that it was a "virtual impossibility" to guarantee that a particular work environment would not trigger a potentially life-threatening allergic reaction.  Despite the overwhelming evidence, ALJ Nisnewitz found that claimant could safely work.  The Court found ALJ Nisnewitz's decision was based on "no evidence."  Instead, the Court found that he relied on "spare and conclusory responses to the ALJ's" own questions. The Court remanded only for the calculation of benefits.

100.    In *Larkins v. Astrue*, 2009 WL 3148763 (E.D.N.Y. Sept. 29, 2009), this Court held that ALJ Nisnewitz "improperly discounted the opinion of treating physicians, including the neurologist . . . who had treated claimant for at least seven years," and instead relied on a non-treating government doctor engaged only for the purpose of the hearing.  In a common theme, the Court emphasized that "the ALJ imposed a stricter standard than is required by law." His decision to cherry-pick medical opinions supporting an adverse finding toward claimant "undermine[d] the court's confidence in the ALJ's assessments of the medical evidence." Contrary to ALJ Nisnewitz's determination, the Court found that the medical evidence established a right to benefits, and the Court remanded only for a calculation of benefits.

101.    In *Baldwin v. Astrue*, 2009 WL 4931363 (S.D.N.Y. Dec. 21, 2009), this Court found, again, that ALJ Nisnewitz failed to abide by the Treating Physician Rule.  Again, the Court was forced to remand in the face of ALJ Nisnewitz's "un-explained decision to credit the opinion of Dr. Rothenberg, a non-examining source, over the [treating physician]," which the court called "improper."

102.    In *Gross v. Astrue*, 2010 WL 301945 (E.D.N.Y. Jan. 15, 2010), this Court determined that ALJ Nisnewitz "disregard[ed] the treating physician's opinion, [and] . . . in effect made [his own] medical findings concerning" plaintiff's hip pain.  In doing so, ALJ Nisnewitz violated a basic precept of the benefit-review process by "form[ing] his own medical opinion" and "set[ting] his own expertise against that of a physician."  He also erred by "failing to provide a basis for disregarding the treating physician's opinion" and, instead, relied upon a purported medical expert who "agreed to cease treating patients in the face of multiple charges of malpractice."  ALJ Nisnewitz's conduct was all the more egregious considering that the Appeals Council had previously remanded the claim due to the reversible error he had committed.  Accordingly, after a second remand was warranted for the exact same errors, the Court ordered the case assigned to a different ALJ.

103.    Similarly, in *Calderon v. Astrue*, 683 F. Supp. 2d 273 (E.D.N.Y. 2010), this Court ordered a second remand of ALJ Nisnewitz's denial based on his repeated failure to properly apply the law.  In 2000, ALJ Nisnewitz's decision was vacated and the matter remanded to him for further proceedings because of his failure to give controlling weight to claimant's treating physician.  A decade later in 2010, claimant's case was again before this Court, and again, the Court found reversible error.  In remanding ALJ Nisnewitz's decision a second time, the Court highlighted his wrongful maneuvering, stating:

> The Court gave Nisnewitz an opportunity to correct his step-five error nearly ten years ago.  Instead, he disregarded the Court's mandate and changed his step-four determination, a tactic that at least suggests an improper attempt to justify, by whatever means necessary, a preordained conclusion that [claimant] was not disabled.  For these reasons, the Court concludes that remand for the calculation of benefits is warranted.

104.    While ALJ Nisnewitz received public rebuke, the real suffering was left to the claimant who unnecessarily spent ten years deprived of disability benefits because of ALJ Nisnewitz's bias.

105.    In *Smith v. Astrue*, 2011 WL 1253233 (E.D.N.Y. Mar. 31, 2011), this Court found that ALJ Nisnewitz did not "abide by the treating physician rule" because he knowingly ignored health records that were available for inspection and instead misleadingly asserted that there was a "lack of record" supporting claimant's symptoms.  Instead of according the appropriate weight to the treating physicians and their associated records, ALJ Nisnewitz relied upon a non-treating physician whose testimony was "afflicted by several defects: cherry-picking from the record, mischaracterizing the record, and placing weight . . . on facts in the record that do not bear that weight."  The Court emphasized that ALJ Nisnewitz should have contacted the treating physician to give him a chance to address any discrepancy ALJ Nisnewitz saw in his assessment.  Based on these failures to properly apply the law, among other errors, the case was remanded for proper application of the Treating Physician Rule.

**(3)     Erroneous Credibility Determination**

106.    In several cases, this Court found ALJ Nisnewitz in error for making adverse credibility findings against claimants, including by consistently disregarding their descriptions of the pain endured as a result of their disabling conditions.  Below are several notable examples, demonstrating a clear pattern between 2008 and the present:

107.    In *Ginsberg v. Astrue*, 2008 WL 3876067 (E.D.N.Y. Aug. 18, 2008), ALJ Nisnewitz "summarily determined that Plaintiff was not entirely credible" without fully understanding the nature of her affliction.  In ruling that his credibility determination lacked basis, this Court noted that claimant's ability to care for herself at times was wholly consistent

with the fluctuations in frequency and severity of her chronic fatigue syndrome.  The Court remanded the case, with specific directions to review claimant's credibility according to law.

108.    In *Larkins v. Astrue*, 2009 WL 3148763 (E.D.N.Y. Sept. 29, 2009), ALJ Nisnewitz failed to accord the proper weight to claimant's "long employment history" and found claimant's multiple sclerosis-related pain complaints not credible in light of MRI results. In remanding the case solely for the calculation of benefits, this Court found claimant's statements to be supported by the reports of multiple neurologists and determined that "no evidence [existed] that [claimant] is prone to exaggeration."

109.    In *Gross v. Astrue*, 2010 WL 301945 (E.D.N.Y. Jan. 15, 2010), ALJ Nisnewitz found that claimant's complaints of pain related to her documented congenital hip dysplasia lacked credibility, and he erroneously opined that "there is little in the record to support this allegation objectively."  He based his rejection of claimant's credibility on the timing of her application for disability benefits, which coincided with the birth of her second child, leading him to theorize – without any support in the record – that claimant was trying to game the system by using Social Security benefits to support her child.  In remanding the matter for additional proceedings, the Court found that ALJ Nisnewitz "rejected plaintiff's claims of subjective pain without any meaningful basis in the record for doing so."

**(4)    High Denial Rate**

110.    Disposition data for 2005-2008 shows that ALJ Nisnewitz denied 56% of the claims before him, a rate 28 percentage points higher than the average.  In fact, ALJ Nisnewitz was in the top 5% of deniers nationally for that period.

111.    More recent data confirms this stunning trend has continued, as ALJ Nisnewitz's denial rate for the period between September 25, 2010 and March 25, 2011 (the most recent reporting period for SSA) has in fact increased to 60%.

112.    When considered in the context of ALJ Nisnewitz's routine and consistent failure to follow legal rules, egregious reversal rate, severe criticisms by federal courts, as well as the same failings of the other Named ALJs, the denial rates constitute unmistakable circumstantial evidence of bias and gross incompetence.

### b)     ALJ Michael D. "Manuel" Cofresi

113.    Since January 1, 2008, nineteen district court cases identified ALJ Cofresi as the author of the decision under review.  This Court found he committed errors serious enough to warrant remand in fourteen cases.  There is little doubt, when the overall record is considered, that ALJ Cofresi's consistent errors are highly probative of his anti-claimant bias.

114.    On information and belief, ALJ Cofresi is almost always hostile towards claimants, and often focuses on the claimant's immigration status, drug addiction, or criminal past in order to make an adverse credibility finding about medical issues.

115.    As demonstrated below, ALJ Cofresi regularly distorts the record and ignores the law, particularly the Treating Physician Rule, in order to justify a predetermined decision that benefits should be denied.  ALJ Cofresi regularly disregards claimant testimony regarding the claimant's impairment and refuses to apply the preponderance of the evidence standard.

### (1)     Failure to Develop the Record

116.    In several of ALJ Cofresi's cases, this Court found him to be in error for failing to develop the record.  The Court's factual findings are wholly consistent with a clear pattern of

his denial of meritorious claims based on pre-existing bias against claimants.  Below are several notable examples, demonstrating a clear pattern between 2008 and the present:

117.     In *Day v. Astrue*, 2008 WL 63285 (E.D.N.Y. Jan. 3, 2008), this Court found that ALJ Cofresi decided "to read conclusions into the Medical Expert's testimony that are not supported therein" and, through his questioning, "succeeded in convincing [the expert] to cabin her initial conclusion."  The Court also found that ALJ Cofresi had decided to "discredit the treating physician's conclusions because of his penmanship."  The Court cautioned ALJ Cofresi, on remand, regarding the admissibility of "retrospective opinions" by medical experts, and the court imposed a strict 90-day time limit on remand proceedings.

118.     In *Taylor v. Astrue*, 2008 WL 2437770 (E.D.N.Y. June 17, 2008), the Commissioner conceded that ALJ Cofresi erred, and this Court found that, among many other errors, ALJ Cofresi had failed in his fundamental duty "to elicit further supporting information" before rejecting a doctor's medical opinion.

119.     In *Vicari v. Astrue*, 2009 WL 331242 (E.D.N.Y. Feb. 10, 2009), the Commissioner agreed, on appeal, that ALJ Cofresi's underlying decision contained "multiple legal errors and cannot be affirmed."  Among other errors, the Court found that ALJ Cofresi's determination about the severity of claimant's disability was "at odds with established precedent."  The Court was so concerned about ALJ Cofresi's conduct that it ordered a different ALJ to preside over the case on remand.  Taking additional precaution, the Court included lengthy directives to the new ALJ, to make sure the record was fully developed on remand and all medical evidence considered objectively.

120.     In *Valerio v. Comm'r of Soc. Sec.*, 2009 WL 2424211 (E.D.N.Y. Aug. 6, 2009), this Court again reversed ALJ Cofresi's decision, this time with a specific order to award

benefits to claimant. The Court used harsh language to describe claimant's plight: "Now, after the ALJs' and Appeals Council's repeated misapplication of the treating physician's rule and failure to supplement the record, and ten years since plaintiff originally filed for SSD[] benefits, there is no showing that further development of the record and additional proceedings would result in the evidence required to substantiate a conclusion that [claimant] is not disabled." To the contrary, the court found "substantial evidence in the record that [claimant] is disabled," and ordered benefits to be awarded.

121.    In *Lopez v. Comm'r of Soc. Sec.*, 2009 WL 2922311 (E.D.N.Y. Sept. 8, 2009), this Court found that ALJ Cofresi failed to "supplement the administrative record" as was his "affirmative duty." The Court found that, although ALJ Cofresi disregarded medical testimony because of inconsistencies in, or an absence of, those physicians' medical records, he "failed" or "made no attempt" to get the records.

122.    In *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330 (E.D.N.Y. 2010), this Court found that ALJ Cofresi failed to develop the record sufficiently, including by failing to obtain "any treatment records" demonstrating claimant's disability. The Court held that the record included "numerous references—spanning dozens of pages . . . [but that the treating doctor's records and notes were] conspicuously absent from the record." Indeed, the Court concluded that ALJ Cofresi, rather than addressing the merits of claimant's disability "omitted *any* discussion of the nature or severity of" claimant's disability or its impact on his functioning. Because of the Court's assessment that the record was "so deficient" and ALJ Cofresi's delay was "particularly egregious," the Court mandated that remand proceedings occur within 120 days.

123.    In *Talavera v. Astrue*, 2010 WL 3325408 (E.D.N.Y. Aug. 19, 2010), ALJ
Cofresi inherited a case where a claimant had to endure a 10-year fight to secure benefits,
during which ALJ denials from QODAR were remanded three separate times for failing to
follow the law and failing to develop the record.   At a fourth hearing, ALJ Cofresi again denied
benefits, failing to address claimant's obesity as a disability.   Though complimentary of his
handling of a complex case with a long history, the Court nevertheless remanded, finding:  "All
previous remand orders in this matter have also stated that the ALJ is to evaluate [claimant's]
obesity under the applicable Social Security ruling," but that ALJ Cofresi failed to do so.   ALJ
Cofresi also failed to develop the record concerning claimant's "fibromyalgia-like syndrome."
Despite specific directions from the Appeals Council to develop the record on these two issues,
"no attempt to supplement that record has been shown."

124.    In *Holder v. Astrue*, 2010 WL 3322507 (E.D.N.Y. Aug. 20, 2010), this Court
found that ALJ Cofresi again failed to develop the record, in a case involving a *pro se* claimant.
In doing so, ALJ Cofresi repeatedly noted that information was missing from the factual record,
but "nevertheless reached a conclusion as to [claimant's] disability," ignoring his "heightened
obligation" to develop the record.

### (2)    Failure to Follow the Law

125.    In several of ALJ Cofresi's cases, this Court found him to be in error for failing
to follow the law, including by repeatedly ignoring the Treating Physician Rule.   Below are
several notable examples, demonstrating a clear pattern between 2008 and the present:

126.    In *Kirkland v. Astrue*, 2008 WL 267429 (E.D.N.Y. Jan. 29, 2008), this Court did
not need to find that ALJ Cofresi failed to follow the Treating Physician Rule, because the
Commissioner conceded as much on appeal.   ALJ Cofresi had denied benefits, and the case

went to the Appeals Council for review.  The Appeals Council reversed, finding that "a significant amount of medical evidence was missing from the file."  On remand, ALJ Cofresi conducted more proceedings and issued an opinion that "discounted the opinions of every doctor other than" one who had never examined claimant (and found no evidence of a disability).  The Appeals Council remanded again with specific directions.  After another hearing, ALJ Cofresi again denied benefits, again failing to fully address the Appeals Council's concerns.  The Appeals Council this time denied review.  After claimant filed an action in the Eastern District, the Commissioner conceded error.  This process, and all its many proceedings, left claimant without benefits from 1994 until 2006.  In remanding the case of a claimant with a 22-year work history at the same job before becoming disabled, the Court found that "[a]lthough it has been almost 15 years since [claimant] first filed for benefits, there are still significant gaps in the record and inconsistencies in the medical evidence."

127.    In *Taylor v. Astrue*, 2008 WL 2437770 (E.D.N.Y. June 17, 2008), this Court again was compelled to remand a decision by ALJ Cofresi for his failure to follow the Treating Physician Rule.  While recognizing the discretion to assign less weight under the rule, the Court bluntly chided him, saying "[w]hen a treating physician's medical opinion is not given controlling weight, an ALJ cannot simply disregard it outright."  The Court found that, through claimant's "decade[-]long sojourn" to secure benefits, ALJ Cofresi "twice committed legal error, even after explicit instructions from the Second Circuit."  Indeed, the Court further found that ALJ Cofresi's repeated commissions of legal error "[demonstrated] serious negligence and could possibly even suggest bias."

128.    In *Vicari v. Astrue*, 2009 WL 331242 (E.D.N.Y. Feb. 10, 2009), the Commissioner conceded ALJ Cofresi's "multiple legal errors."  In deciding to remand to a

different ALJ, this Court bemoaned the "manifest legal errors," which had the effect of dragging claimant "up and down the administrative ladder." The Court put the problem in blunt terms: "[T]he fact remains that [ALJ Cofresi's decision], which was authored with the benefit of multiple remand orders from the Appeals Council, contained fundamental errors of law and evinced a failure on the part of the presiding ALJ to consider the full medical evidence before him."

129.    In *Lawler v. Astrue*, 09-CV-1077-ARR (E.D.N.Y. Aug. 30, 2010), this Court found that ALJ Cofresi "committed numerous errors by failing to apply the correct legal standards" in denying benefits, a result that was "not supported by substantial evidence." This Court found that ALJ Cofresi "never explained why he disregarded" the opinions of multiple treating physicians in reaching a conclusion for which "there is absolutely no medical evidence in the record" in support. The Court concluded that sufficient evidence in the record justified remand of claimant's case for a closed period solely for calculation of benefits, and further instructed the Commissioner to remand the remaining portion of claimant's benefits claim "to a new ALJ because [ALJ Cofresi's] decision reveals his refusal to consider evidence impartially.... In addition, ALJ Cofresi exhibited bias and an inappropriate hostility toward the plaintiff." The Court explained that ALJ Cofresi's "threats that plaintiff could be indicted and his immigration status could be jeopardized, in addition to his failures to apply the well established treating physician rule and to consider a closed period of disability, raise serious concerns about his impartiality and fundamental fairness to this plaintiff."

130.    In *F.M. ex rel B.M.*, 2009 WL 2242134 (E.D.N.Y. July 27, 2009), ALJ Cofresi ignored "persuasive proof" of an infant's disability, including "severe receptive and expressive language delays," causing the Commissioner to concede error on appeal. This Court found it

would be "futile" to remand the matter, because "the only conclusion supported by the record evidence is that [the infant] suffers" from a disability.

131.    In *Lopez v. Comm'r of Soc. Sec.*, 2009 WL 2922311 (E.D.N.Y. Sept. 8, 2009), this Court found that ALJ Cofresi violated the Treating Physician Rule with his "impermissible evaluation of [the doctor's] findings based on his own judgment." Indeed, ALJ Cofresi "noted that five physicians, including [claimant's] three treating physicians, determined that [claimant] was disabled, [but] he did not explain why the balance of the medical evidence justified disregarding those opinions." In this regard too, the Court found that ALJ Cofresi engaged in "speculation" and "improperly applied his own judgment" rather than objectively evaluating the overall medical evidence.

132.    In *King v. Astrue*, 2009 WL 3300261 (E.D.N.Y. Oct. 14, 2009), this Court found that ALJ Cofresi "disregard[ed] the treating physicians' opinions," in violation of "controlling regulations." In this matter, ALJ Cofresi ignored not just one but three consistent opinions from claimant's treating physicians. The Court found remand futile, saying "this is [claimant's] eleventh judicial proceeding following her request for [benefits] over twelve years ago." Thus, the Court awarded benefits.

133.    In *Regan v. Astrue*, 2010 WL 1459194 (E.D.N.Y. April 12, 2010), this Court remanded ALJ Cofresi's denial of benefits, again, because of his violation of the Treating Physician Rule. The Court found that ALJ Cofresi "rejected entirely" the doctor's diagnosis despite the fact that it was "based on the sorts of observable medical signs and symptoms well-accepted within" the doctor's field of expertise.

134.    In *Milien v. Astrue*, 2010 WL 5232978 (E.D.N.Y. Dec. 16, 2010), this Court remanded ALJ Cofresi's denial of benefits to a woman with a 24-year work history, who

suffered from AIDS-related dementia and obesity.  The Court catalogued a laundry list of errors, including ALJ Cofresi's failure to state any basis for disregarding a "potentially dispositive [medical] report" from claimant's treating physician.

(3)     **Erroneous Credibility Determinations**

135.     In several cases, this Court found ALJ Cofresi in error for making adverse credibility findings against claimants, including by consistently disregarding their descriptions of the pain endured because of their disabling conditions.  Below are several notable examples, demonstrating a clear pattern between 2008 and the present:

136.     In *King v. Astrue*, 2009 WL 3300261 (E.D.N.Y. Oct. 14, 2009), this Court found that ALJ Cofresi "did not objectively assess the credibility of" claimant.  The claimant had testified about multiple places where her condition caused pain, which she rated "as a seven on a scale of ten."  Claimant testified that her pain limited her ability "to carry more than five pounds."  Indeed, she testified that, because of her condition, she "cannot hold a cup for too long before it slips out of her hand."  The Court found these descriptions "supported by the extensive record in this case."

137.     In *Regan v. Astrue*, 2010 WL 1459194 (E.D.N.Y. Apr. 12, 2010), this Court found that ALJ Cofresi's decision to discredit a claimant "was not based on an evaluation of the appropriate factors."  While rejecting claimant's testimony about "panic attacks, debilitating depression, and [almost daily] visual hallucinations of her deceased daughter," ALJ Cofresi instead relied on "his interpretation of counseling records . . . suggesting that [claimant's] symptoms had improved."  He did so despite the absence of such an opinion from any doctor.

138.     In *Milien v. Astrue*, 2010 WL 5232978 (E.D.N.Y. Dec. 16, 2010), this Court remanded ALJ Cofresi's denial of benefits to a woman with a 24-year work history who

suffered from AIDS-related dementia and obesity.  ALJ Cofresi found claimant's testimony

lacked credibility, in part, because she had not sought treatment for her dementia-related

symptoms.  The Court said,

> [Although claimant] did not allege that her failure to seek psychological
> treatment was due to her financial status, it was not proper for the ALJ to draw
> an inference against her given that, moments prior to being asked about her
> psychological treatment, she had stated that she could no longer visit her
> infectious disease specialist due to her lack of insurance . . . if the ALJ was
> concerned about [claimant's] reasons for not seeking psychological treatment, he
> should have asked her about them.  Perhaps, upon hearing the answer, he might
> not have concluded that she was testifying falsely about her pain and depression.

### (4)   High Denial Rate

139.    Disposition data for 2005-2008 (the period immediately preceding all of the

matters described above), shows that ALJ Cofresi denied 57% of the claims before him, a rate

29 percentage points higher than the national average.  In fact, ALJ Cofresi was in the top 4% of

deniers nationally for that period.

140.    More recent data confirms this stunning trend has continued, as ALJ Cofresi's

denial rate for the period between September 25, 2010 and March 25, 2011 (the most recent

reporting period for SSA) in fact increased to 62%.

141.    When considered in the context of ALJ Cofresi's routine and consistent failure to

follow legal rules, egregious reversal rate, and severe criticisms by federal courts, the denial rate

constitutes unmistakable circumstantial evidence of bias and gross incompetence.

### c)   ALJ Seymour Fier

142.    Since January 1, 2008, twelve district court cases identified ALJ Fier as the

author of the decision under review.  This Court found he committed error serious enough to

warrant remand in ten cases.  There is little doubt, when the overall record is considered, that

ALJ Fier's consistent errors are highly probative of his anti-claimant bias.

143.   ALJ Fier regularly manipulates the evidentiary record through combative

questioning, the refusal to admit relevant evidence, and in some cases, by coaching non-treating

physicians so they avoid cross-examination.  ALJ Fier also violates the Treating Physician Rule

by cherry-picking facts that distort the record so as to support his predetermined conclusion to

deny benefits.

144.   On information and belief, ALJ Fier regularly engages in off-the-record

intimidating tactics to pressure claimants to withdraw their benefits claims.  These tactics

include threatening to review a previously approved claim, and inappropriately attempting to

negotiate a partial approval or closed period, only to then deny the claim entirely when ALJ

Fier's "offer" is rejected.

145.   Furthermore, ALJ Fier routinely disregards explicit instructions from the district

court and the Appeals Council on remand in order to justify denying benefits claims.

146.   Taken together, this conduct demonstrates a clear and convincing pattern of

general bias against the award of benefits to deserving claimants.

### (1)   Failure to Develop the Record

147.   In several of ALJ Fier's cases, this Court found him to be in error for failing to

develop the record.  The Court's factual findings are wholly consistent with a clear pattern of

his denial of meritorious claims based on a pre-existing bias against claimants.  Below are

several notable examples, demonstrating a clear pattern between 2008 and the present:

148.   In *Gonzalez v. Astrue*, 2008 WL 755518 (E.D.N.Y. Mar. 20, 2008), this Court

had earlier remanded ALJ Fier's denial of benefits based on his failure to adequately develop

the evidentiary record.  When the case came back to the Court, it was clear that ALJ Fier had

not followed the Court's instructions.  The Commissioner, in fact, agreed to remand.  Not only

had ALJ Fier again failed to develop the record, but he also relied on the opinion of an SSA

expert who had been "remov[ed] from the New York State Agency panel of physicians eligible

to perform consultative examinations for the SSA." He did so despite a specific, internal

directive from the SSA that the expert's opinions were "no longer entitled to any weight."

Thus, on remand, the Court had to specifically instruct ALJ Fier not to rely on that expert's

report, and, in light of the fact that claimant had "endured significant delays," the Court

"strongly urge[d]" the Commissioner to resolve the matter within 90 days.

     149.    In *Rustico v. Astrue*, 2008 WL 2622926 (E.D.N.Y. July 1, 2008), this Court

remanded ALJ Fier's denial of benefits to a 65-year-old woman who had worked at the same

job for 22 years. Finding that ALJ Fier failed to develop the record, including by deciding that

an indigent woman should have paid for medical tests to prove her disability, the court gave a

special instruction on remand: "The ALJ is further ordered to refrain from making medical

findings and to reevaluate [claimant's] credibility." The Court further found that ALJ Fier's

decision was "replete with conclusory statements and without specific reference to the medical

record necessary for the effective review of the Commissioner's decision." The Court ordered

the Commissioner to "commence [further] proceedings within sixty days" of the Court's order.

     150.    In *Savino v. Astrue*, 2009 WL 2045397 (E.D.N.Y. July 8, 2009), this Court

remanded ALJ Fier's denial of benefits based on numerous failures to develop the record,

despite his affirmative obligation to do so. ALJ Fier committed these errors and ignored

"explicit instructions" from the Appeals Council, which had previously remanded the case to

correct prior errors. In evaluating ALJ Fier's decision, the Court said, "ALJ Fier's reasoning

does not make sense." The Court further observed, "ALJ Fier ignored the remand order to use a

vocational expert to help determine whether plaintiff could perform his past relevant work."

Despite instructions from the Appeals Council that the new testimony should be used to address any conflicts in the record, ALJ Fier also "confined" a new medical expert's testimony to resolving an inconsistency between two other experts. And, over claimant's objection, ALJ Fier refused to provide claimant's expert with all relevant medical records. For these and other reasons, the Court concluded: "In sum, ALJ Fier disregarded the Appeals Council's explicit directives. On that basis alone, remand is required."

151.    In *Zubizarreta v. Astrue*, 2010 WL 2539684 (E.D.N.Y. June 16, 2010), this Court remanded ALJ Fier's denial of disability benefits to a retired police sergeant with nearly 20 years of service based on "several legal and factual errors." Embarrassingly, the Commissioner was forced to concede error and consent to remand despite the Appeals Council having previously remanded ALJ Fier's denial based on earlier errors. In this second review, the Court found a litany of errors, including ALJ Fier's reliance on allegedly contradictory medical opinions. "[A] closer review," according to the Court, "indicates that a majority of the physicians' findings are consistent" with the treating physician's determination. Noting that ALJ Fier had "two chances to fully develop the record," the Court concluded that further proceedings were "futile" and directed remand solely for the calculation of benefits. Not surprisingly, the Court, again, directed that remand be to a different ALJ. In this instance, the Commissioner also agreed. Still, the Court gave special instructions for additional determinations about the onset date for claimant's disability, requiring that the different ALJ offer "a convincing rationale for the date chosen."

152.    In *McDowell v. Comm'r of Soc. Sec.*, 2010 WL 5026745 (E.D.N.Y. Dec. 3, 2010), this Court remanded ALJ Fier's denial of benefits. In doing so, a frustrated Court recounted ALJ Fier's view that claimant's disability was not sufficiently severe to merit

benefits.  "In his Notice and Decision, however, the ALJ did not devote even a single sentence

of analysis to [support] this finding."  In response to the Commissioner's position that a single

line of testimony in the hearing transcript was support for ALJ Fier's decision, the Court gave a

terse response:  "Suffice it to say that the single line of testimony from the medical examiner

was not 'substantial evidence' for the ALJ to make his determination."  To further punctuate the

Court's frustration, the Court directed the Commissioner "to assign the claim to a different

ALJ" on remand.  The Court also gave specific instructions, based on problems inherent in the

testimony of the Commissioner's vocational expert, that "the Commissioner must obtain new

testimony from a [vocational expert]."[2]

### (2)    Failure to Follow the Law

153.    In several of ALJ Fier's cases, this Court found him to be in error for failing to

follow the law, including by repeatedly ignoring the Treating Physician Rule.  Below are

several notable examples, demonstrating a clear pattern between 2008 and the present:

154.    In *Gonzalez v. Astrue*, 2008 WL 755518 (E.D.N.Y. Mar. 20, 2008), the

Commissioner agreed that ALJ Fier's determination was "based on legal error, and that [the

Court] must accordingly remand the decision for further proceedings."  This Court further

noted, "[t]he Commissioner recognizes that the ALJ's decision [was] inconsistent, ambiguous

and contains legal error" for, among other reasons, failing to follow the Treating Physician

Rule.

---

[2]  Similarly, in *Murray v. Astrue*, 2010 WL 5290063 (E.D.N.Y. Dec. 20, 2010), this Court
found that ALJ Fier erred by refusing plaintiff's request to call a vocational expert and that
ALJ Fier had misstated plaintiff's evidence.  The Court found these errors were not
reversible.

155.    In *Rustico v. Astrue*, 2008 WL 2622926 (E.D.N.Y. July 1, 2008), this Court, in remanding another denial of benefits, said bluntly: "It is evident that the ALJ improperly applied the treating physician rule." Indeed, ALJ Fier could not offer a sufficient explanation for his failure to give controlling weight to claimant's treating physician.

156.    In *Henry v. Astrue*, 2008 WL 2697317 (E.D.N.Y. July 3, 2008), this Court again remanded ALJ Fier for failing to follow the Treating Physician Rule. Again, the Commissioner consented to the remand of this case, conceding "that the ALJ's decision was based on legal error."

157.    In *Motley v. Astrue*, 2008 WL 2755840 (S.D.N.Y. July 14, 2008), this Court found ALJ Fier's decision "arbitrary," "illogical" and "not supported by substantial evidence." The Court held that the decision should be remanded solely for the calculation of benefits.

158.    In *Hach v. Astrue*, 2010 WL 1169926 (E.D.N.Y. Mar. 23, 2010), this Court remanded ALJ Fier again for his failure to correctly assess the weight accorded to a treating physician. Although the Court found ALJ Fier did not err in refusing to give the treating physician controlling weight on disability, "the ALJ did commit legal error in failing to properly determine how much weight should be afforded." The Court concluded: "The ALJ's incomplete analysis on this score constitutes proper grounds for remand." On remand, the Court gave ALJ Fier specific instruction to conduct the appropriate analysis under the applicable regulations.

159.    In *Zubizarreta v. Astrue*, 2010 WL 2539684 (E.D.N.Y. June 16, 2010), while, as described above, this Court remanded for factual errors, as described above, the Court found that "the ALJ's most significant error" was under the Treating Physician Rule. The Court bluntly concluded: "The Court is hard-pressed to find any evidence, let alone substantial

evidence, that is inconsistent or contradicts" the treating physician's medical opinion on disability. The Commissioner conceded this point in consenting to a remand and reassignment to a different ALJ.

160.    ALJ Fier's clear choice to misapply and ignore standards for treating physicians continues. Less than two months ago, in *Dooknah v. Astrue*, 2011 WL 997196 (E.D.N.Y. Mar. 21, 2011), ALJ Fier's denial of benefits was again remanded because he "committed legal error by failing to give adequate (or indeed, any) weight to the opinion of [claimant's] treating physician." The Court remanded solely for the calculation of benefits, finding that "the record evidence persuasively establishes that [claimant] was disabled due to chronic and ongoing back pain prior to October 9, 2009."

### (3)    Erroneous Credibility Determination

161.    In several cases, this Court found ALJ Fier in error for making adverse credibility findings against claimants, including by consistently disregarding their descriptions of the pain endured because of their disabling conditions. Below are several notable examples, demonstrating a clear pattern between 2008 and the present:

162.    In *Rustico v. Astrue*, 2008 WL 2622926 (E.D.N.Y. July 1, 2008), this Court, in remanding another denial of benefits, found error in ALJ Fier's unsupported and ambiguous decision to discredit a woman with a 22-year-work history with the same employer. "Because the ALJ finds the claimant is not credible," the Court held, "he must set forth the reasons for that finding 'with sufficient specificity to permit intelligible plenary review of the record.'"

163.    In *Savino v. Astrue*, 2009 WL 2045397 (E.D.N.Y. July 8, 2009), this Court again determined that ALJ Fier discounted a claimant's testimony without sufficient basis. Having already determined that ALJ Fier disregarded the Appeals Council's "explicit directives,"

requiring remand, the Court further noted its strong disagreement with ALJ Fier's decision to, and stated basis for, discrediting claimant.  None of ALJ Fier's proffered explanations, according to the Court, "provides grounds for disbelieving [claimant's] testimony about his symptoms."  The Court concluded that "closer examination of the specific manner in which [claimant] has [lived his life] reveals that [his] activities highlight, rather than undermine, the severity of his limitations."  The Court thus remanded for reconsideration on this issue, directing the ALJ to give due weight to claimant's "long work history, which may be probative of credibility."

164.    In *McDowell v. Comm'r of Soc. Sec.*, 2010 WL 5026745 (E.D.N.Y. Dec. 3, 2010), this Court remanded ALJ Fier's denial of disability, in part, because of the basis on which ALJ Fier discounted claimant's testimony about the painful nature of her disability.  The Court found ALJ Fier erred in "determin[ing] that [claimant's] statements . . . were not credible in a single, conclusory pen-stroke without providing even a modicum of analysis or a token recitation of a single fact," constituting "both legal error and a lack of substantial evidence."  As noted above, the Court demanded reassignment to a new ALJ on remand.

### (4)    High Denial Rate

165.    Disposition data for 2005-2008 shows that ALJ Fier denied 55% of the claims before him, a rate 27 percentage points higher than the national average.  In fact, ALJ Fier was in the top 6% of deniers nationally for that period.

166.    More recent data confirms this stunning trend has continued, as ALJ Fier's denial rate for the period between September 25, 2010 and March 25, 2011 (the most recent reporting period for SSA) has in fact increased to 64%.

167.     When considered in the context of ALJ Fier's routine and consistent failure to

follow legal rules, egregious reversal rate, and severe criticisms by federal courts, the denial

rates constitute unmistakable circumstantial evidence of bias and gross incompetence.

### d)      ALJ Marilyn P. Hoppenfeld

168.     Since January 1, 2008, there are twelve district court decisions where ALJ

Hoppenfeld is identified as the author of the decision under review.  This Court found she

committed error in eleven cases.  There is little doubt, when the overall record is considered,

that ALJ Hoppenfeld's consistent errors are highly probative of her anti-claimant bias.

169.     On information and belief, ALJ Hoppenfeld regularly manipulates the

evidentiary record by aggressively interfering in witness questioning and conducting cross-

examinations designed to elicit misleading information to justify a predetermined decision.

170.     On information and belief, ALJ Hoppenfeld regularly ignores well-settled law,

including the Treating Physician Rule, and cherry-picks facts to justify denying benefits claims.

171.     Taken together, this conduct demonstrates a clear and convincing pattern of bias

against the award of benefits to deserving claimants.

### (1)      Failure to Develop the Record

172.     In several of ALJ Hoppenfeld's cases, this Court found her to be in error for

failing to develop the record.  The Court's factual findings are wholly consistent with a clear

pattern of her denial of meritorious claims based on preexisting bias against claimants for

disability benefits.  Below are several notable examples, demonstrating a clear pattern between

2008 and the present:

173.     In *Tempesta v. Astrue*, 2009 WL 211362 (E.D.N.Y. Jan. 28, 2009), this Court

held that ALJ Hoppenfeld failed to fulfill her "affirmative duty to seek [claimant's] medical

records from [the treating physician]" and that there was "no indication in the record that the ALJ attempted to comply with this duty." The Court also found that ALJ Hoppenfeld had "failed to affirmatively develop the record; misunderstood the nature of [claimant's] diagnosed condition . . . [and] inexplicably gave credence to [claimant's] delusional statement . . . that he was a successful businessman." Moreover, ALJ Hoppenfeld suggested during the hearing "that [claimant] had an 'unrealistic interpretation of [his] physical signs or sensation[s]' . . . and bizarrely inquired whether [claimant] had discussed 'sexual orientation' with his psychiatrist—a topic appearing nowhere else in the record and of no conceivable relevance."

174. In *Pierre v. Astrue*, 2010 WL 92921 (E.D.N.Y. Jan. 6, 2010), this Court held that ALJ Hoppenfeld failed to develop the record where the medical records of a treating physician who had seen claimant for three years were "entirely absent from the record." This was after three prior hearings held over a span of more than ten years – two with ALJ Cofresi, and one with ALJ Hoppenfeld. All three were remanded by the Appeals Council. Despite the long process endured by claimant, this Court was forced to remand the case again because of insufficient development of the record, with instructions that the proceedings be held as quickly as possible.

175. In *Brown v. Astrue*, 2010 WL 2195568 (E.D.N.Y. May 28, 2010), this Court held, again, that ALJ Hoppenfeld "failed to adequately develop the record" where "the administrative transcript contained virtually no records from [the treating physician]" who stated that he had treated claimant on a monthly basis for at least two years. In fact, the Court noted that there was "no indication that the ALJ made any effort to obtain [claimant's] complete medical file from [the treating physician]," in violation of her affirmative duty. This Court ultimately remanded the case to ALJ Hoppenfeld for further development.

176.    In *Tiborsky v. Astrue*, 2010 WL 2730791 (E.D.N.Y. July 8, 2010), this Court found, yet again, that ALJ Hoppenfeld failed to fulfill her affirmative duty to develop the record and ordered remand to the Commissioner for further proceedings.

177.    In *Maline v. Astrue*, 2010 WL 4258259 (E.D.N.Y. Oct. 21, 2010), ALJ Hoppenfeld denied benefits to an electrician of twenty years who became disabled after falling from a ladder, severely injuring his hip and back.  This Court held that, among other errors, ALJ Hoppenfeld had failed to develop the record when she failed to contact "[the treating physicians] for clarification" before finding that the "treating physicians' statements were not supported by adequate evidence in the record."  The Court remanded the case with explicit instruction to "further develop the evidence."

### (2)    Failure to Follow the Law

178.    In all eleven of ALJ Hoppenfeld's remanded cases, this Court found her to be in error for failing to follow the law, including by repeatedly ignoring the Treating Physician Rule. Below are several notable examples, demonstrating a clear pattern between 2008 and the present:

179.    In *Schnetzler v. Astrue*, 533 F. Supp. 2d 272 (E.D.N.Y. 2008), this Court remanded the case to ALJ Hoppenfeld for further development, finding that she had "failed to even acknowledge the treating physician rule."  The Court explained that she had "failed to adequately explain what good reasons she had in discounting the opinions of [claimant's] treating physicians," and that her "total silence on the weight accorded" various treating physicians "was error."  These errors persisted even after three hearings before other ALJs.  In addition, the Court noted that there was "no indication in the record that the ALJ considered any [statutory factors] when viewing the opinions of [claimant's] treating physicians."  The Court

also held that ALJ Hoppenfeld "improperly substituted her opinion for the observations of [claimant's] physicians, and the opinion of the medical expert."

180.    In *Kearney v. Astrue*, 2008 WL 2705525 (E.D.N.Y. July 11, 2008), this Court criticized ALJ Hoppenfeld for her "baffling failure to apply the treating-physician rule" after it had remanded this very case in 2006 with explicit instructions to reconsider the claim "in accordance with the treating physician rule." Instead of following the order on remand, "ALJ Hoppenfeld, for reasons defying comprehension, chose to repeat the same error that caused [the judge] to remand the case to the Commissioner." Indeed, ALJ Hoppenfeld acknowledged "on the record at the supplemental hearing, that the purpose of the remand was to consider the opinion of [claimant's] treating doctors." Judge Gleeson punctuated his decision by noting "that ALJ Hoppenfeld has apparently held her current position since at least 1985 . . . I do not see how ALJ Hoppenfeld could have failed to understand my order, and am at a loss as to why she failed to comply with it." The Court further noted claimant's "nine-year quest for disability insurance benefits" and was so concerned with ALJ Hoppenfeld that the Court remanded the case for a calculation of benefits only and directed the Commissioner to assign the case to a different ALJ upon remand.

181.    In *Silva v. Astrue*, 2008 WL 4911767 (E.D.N.Y. Nov. 14, 2008), this Court found, again, that ALJ Hoppenfeld misapplied the Treating Physician Rule in her "flawed" analysis, in which she "minimized the significance of [the treating physician's] findings and mischaracterized them." The court punctuated this finding by describing other errors, including her decision to "largely dismiss[]" key evidence, analysis that was "simply wrong," and conclusions that amounted to a "substitution . . . of her own judgment" for the treating physician's. The Court held that "further administrative proceedings in this case would serve

no purpose . . . [and remanded the case solely] for the purpose of calculating benefits." The Court noted that this disposition was "'particularly appropriate' in light of the fact that [claimant's] application has been pending since February 16, 2000."

182.   In *Tempesta v. Astrue*, 2009 WL 211362 (E.D.N.Y. Jan. 28, 2009), this Court found that ALJ Hoppenfeld "misapplied the treating physician rule by discounting [the treating physician's] opinions for improper reasons," such as lack of objective findings and conflicts with a state examiner.  Moreover, the Court found that ALJ Hoppenfeld's assessment of claimant's physical abilities was "plucked from thin air."  Ultimately, the Court held that, contrary to ALJ Hoppenfeld's findings, "the treating physician rule compels a finding of disability as to that period, [and ordered] an immediate calculation of benefits."

183.   In *Pierre v. Astrue*, 2010 WL 92921 (E.D.N.Y. Jan. 6, 2010), this Court held, once again, that ALJ Hoppenfeld failed to apply the Treating Physician Rule.  Additionally, the Court found that ALJ Hoppenfeld "utterly failed to perform the required task of determining what weight" the treating physicians' opinions deserved and that this "constitute[d] an independent legal error warranting remand."

184.   In *Brown v. Astrue*, 2010 WL 2195568 (E.D.N.Y. May 28, 2010), this Court remanded to ALJ Hoppenfeld, finding that she had erred in not giving the treating physician's opinion controlling weight because it "is supported by the medical record . . . [and] the ALJ failed to provide sufficient reasons for disregarding [the treating physician's] opinion."  Indeed, the Court noted that ALJ Hoppenfeld "did not even mention . . . much less make any effort to apply" the statutory factors for determining the weight of medical opinions as required by regulation.

185.    In *Tiborsky v. Astrue*, 2010 WL 2730791 (E.D.N.Y. July 8, 2010), this Court held that ALJ Hoppenfeld "not only failed to give good reasons for disregarding [the treating physician's] opinion, but arbitrarily substituted her views for those of the medical professionals who had examined [claimant]" and "trivialized [claimant's] impairments by characterizing them as 'low back pain, cervical neck pain and bilateral knee sprain.'"  The Court noted that ALJ Hoppenfeld "chose to rely on her own expertise," rather than on medical experts, in determining claimant's residual functional capacity.

186.    In *Lopez v. Astrue*, 2010 WL 4054116 (E.D.N.Y. Oct. 8, 2010), this Court once again noted ALJ Hoppenfeld's "abject failure" to properly apply the Treating Physician Rule, despite being told on remand from the Appeals Council to "give further consideration to the medical expert opinion."  In particular, the Court pointed out that "the ALJ failed to give reasons why she did or did not consider *five* MRIs supportive of [claimant's] severe lower back pain and [the treating physician's] determinations."  The Court also noted with incredulity that ALJ Hoppenfeld discounted the opinion of the treating physician who had "provided [a] consistent opinion during his six-year treating relationship . . . [where he saw claimant] every two-to-four months" in favor of the opinion of the state physician who met with claimant on one single occasion.  The Court remanded the case to ALJ Hoppenfeld for further proceedings.

187.    In *Maline v. Astrue*, 2010 WL 4258259 (E.D.N.Y. Oct. 21, 2010), in yet another case remanded to ALJ Hoppenfeld for further development, this Court found, for the tenth time in three years, that ALJ Hoppenfeld failed to apply the Treating Physician Rule.  The Court held that ALJ Hoppenfeld improperly discredited the treating physicians' opinions, because among other reasons, "[the opinion] appeared on a 'check-off-the-box "form" assessment.'"

188.    In *Mitchell v. Astrue*, 2010 WL 5437207 (E.D.N.Y. Dec. 23, 2010), the

Commissioner conceded that ALJ Hoppenfeld "committed legal error by failing to properly

consider the medical opinions of two physicians: . . . the ALJ discounted the opinion of [one

doctor] as a non-treating source, despite the fact that the doctor testified he had seen [claimant]

every few months . . . [and] [t]he ALJ did not even address [another treating physician's]

medical opinion at all."

### (3)    Erroneous Credibility Determinations

189.    In several cases, this Court found ALJ Hoppenfeld in error for making adverse

credibility findings against claimants, which included consistently disregarding their

descriptions of the pain endured because of their disabling conditions.  Below are several

notable examples, demonstrating a clear pattern between 2008 and the present:

190.    In *Brown v. Astrue*, 2010 WL 2195568 (E.D.N.Y. May 28, 2010), this Court held

that ALJ Hoppenfeld "erred in discounting [claimant's] subjective claims of pain."  The Court

found that ALJ Hoppenfeld "incorrectly implied" there were no positive neurological findings

where the record contained such findings and that "even if there had been no positive

neurological findings . . . there was still ample evidence to support [claimant's] subjective

claims of pain."

191.    In *Tiborsky v. Astrue*, 2010 WL 2730791 (E.D.N.Y. July 8, 2010), this Court

held that ALJ Hoppenfeld "not only disregarded the doctor's medical opinions, but disregarded

portions of the record and [claimant's] testimony in evaluating [claimant's] claims of pain."

The Court found, "the ALJ *selectively* mentioned only the evidence supporting her contention

that plaintiff's 'activities [were] consistent with light work,' while *ignoring* all evidence to the

contrary." In fact, the Court noted that there was "no indication that the ALJ made any serious attempts to evaluate other relevant factors" that are enumerated in the regulations.

192.    In *Lopez v. Astrue*, 2010 WL 4054116 (E.D.N.Y. Oct. 8, 2010), this Court found ALJ Hoppenfeld's "reasons for not crediting [claimant's] allegations of pain were largely inaccurate" and that ALJ Hoppenfeld had "misrepresented [claimant's] testimony." Indeed, the Court noted ALJ Hoppenfeld "inexplicably" gave "purported reasons for discrediting [claimant's] testimony, but did not explain why she rejected [claimant's] testimony."

193.    In *Maline v. Astrue*, 2010 WL 4258259 (E.D.N.Y. Oct. 21, 2010), this Court held, yet again, that "ALJ Hoppenfeld erred in concluding that [claimant] was not credible without discussing in form or in substance the factors governing credibility determinations." The court remanded this case with explicit instruction to apply the statutory credibility factors.

### (4)    High Denial Rate

194.    Disposition data for 2005-2008 shows that ALJ Hoppenfeld denied 39% of the claims before her, a rate 11 percentage points higher than the national average. In fact, ALJ Hoppenfeld was in the top 23% of deniers nationally for that period.

195.    More recent data confirms this trend has continued, as ALJ Hoppenfeld's denial rate for the period between September 25, 2010 and March 25, 2011 (the most recent reporting period for SSA) in fact increased to 44%.

196.    When considered in the context of ALJ Hoppenfeld's routine and consistent failure to follow legal rules, egregious reversal rate, and severe criticisms by federal courts, the denial rates constitute unmistakable circumstantial evidence of bias and gross incompetence.

### e)   **ALJ Hazel C. Strauss**

197.    Since January 1, 2008, sixteen district court cases identified ALJ Strauss as the author of the decision under review.  District Courts found she committed error in thirteen of these cases.  There is little doubt, when the overall record is considered, that ALJ Strauss's consistent errors are highly probative of her anti-claimant bias.

198.    On information and belief, ALJ Strauss intentionally ignores specific instructions from district courts and the Appeals Council in order to justify the predetermined decision to deny benefits claims.

199.    On information and belief, ALJ Strauss ignores well-settled law, including the Treating Physician Rule, and intentionally cherry-picks evidence in order to justify the predetermined decision to deny benefits claims.

200.    Taken together, this conduct demonstrates a clear and convincing pattern of general bias against the award of benefits to deserving claimants.

### (1)   **Failure to Develop the Record**

201.    In several of ALJ Strauss's cases, this Court found her to be in error for failing to develop the record.  The Court's factual findings are wholly consistent with a clear pattern of her denial of meritorious claims based on preexisting bias against claimants.  Below are several notable examples, demonstrating a clear pattern between 2006 and the present:

202.    In *Harris v. Astrue*, 2008 WL 5517087 (E.D.N.Y. Jan. 20, 2008), ALJ Strauss denied benefits to a *pro se* claimant who suffered from a "severe" panic disorder and depression.  In so doing, ALJ Strauss failed to adequately develop the record because she gave "significant weight" to a non-treating and non-examining consultant but "failed to seek an opinion as to [claimant's] disability from her treating physician."  Thus, "the record was

improperly developed and [claimant] did not receive 'a fair and adequate hearing before the [Commissioner].'" The Court noted that ALJ Strauss's conduct "clash[ed] with the 'essentially non-adversarial nature of a benefits proceeding.'"

203.    In *Bommarito v. Astrue*, 2008 WL 5085093 (E.D.N.Y. Dec. 2, 2008), the Appeals Council had given ALJ Strauss explicit instructions "as to specific methods of developing the record" because the case had already been remanded twice due to legal errors. In direct violation of these instructions, ALJ Strauss again did not properly develop the record by failing to "recontact the claimant's treating physicians" after marginalizing their opinions at the first hearing. This Court remanded the case for an expedited hearing – repeating the explicit instructions already given by the Appeals Council – because "the ALJ has failed to properly develop the record in her consideration of the treating source rule."

204.    In *Robinson v. Astrue*, 2009 WL 4722256 (E.D.N.Y. Dec. 9, 2009), ALJ Strauss committed no less than "four errors warranting remand" when she denied benefits to claimant. Among those errors, ALJ Strauss failed to properly develop the record when she unilaterally determined that claimant's depression was not severe "without input from any professional." She did so despite the existence of "considerable evidence" to the contrary, which should have prompted ALJ Strauss to pursue additional information.

205.    In *Martinez v. Astrue*, 2010 WL 5126224 (E.D.N.Y. Dec. 9, 2010), this Court remanded the case back to ALJ Strauss for additional development of the record after determining that she "failed to carry out her obligation to adequately develop the administrative record" when she declined to seek clarification about claimant's condition from claimant's treating physician, who had provided "ongoing treatment" to claimant "that began more than a year before the end of the relevant time period."

206.    In *Patel v. Astrue*, 2010 WL 5125986 (E.D.N.Y. Dec. 10, 2010), which this Court characterized as "a 12-year-long series of denials and remands," ALJ Strauss "failed to fulfill [her] duty" to fully develop the record because she rejected "out of hand" the opinions of a doctor whom she merely assumed had not treated claimant during the period at issue.  The Court described ALJ Strauss's reason for rejecting the opinions as "insufficient" and a "*non sequitur*."  Regarding ALJ Strauss's conclusion that the doctor's opinion deserved no weight because it did not relate to the relevant time period, the Court simply stated "[t]hat was wrong." The Court remanded the case and directed ALJ Strauss to properly develop the record with regard to this physician.

### (2)      Failure to Follow the Law

207.    In several of ALJ Strauss's cases, this Court found her to be in error for failing to follow the law, including by repeatedly ignoring the Treating Physician Rule.  Below are several notable examples, demonstrating a clear pattern between 2008 and the present:

208.    In *Canton v. Astrue*, 2010 WL 5391184 (E.D.N.Y. Dec. 22, 2010), this Court rejected ALJ Strauss's findings because she "fail[ed] to consider even a single medical opinion [authored by the treating physician] – irrespective of the substantial weight of controverting evidence or a medical opinion's legibility – [which] constitutes reversible error."

209.    In *Scandura v. Astrue*, 2009 WL 648611 (E.D.N.Y. Mar. 10, 2009), ALJ Strauss accorded little weight to a veritable battery of treating physicians, relying instead on the opinions of two SSA doctors, one of whom had never examined claimant and relied on evidence that "seem[ed] to appear out of thin air."  This Court found that ALJ Strauss "too readily dismissed" the opinions of three treating physicians while "ignoring completely" the opinions of

others.  The Court described ALJ Strauss's reasons for dismissing the opinions of claimant's

treating physicians as "questionable" and "unreasonable."

210.    In *Primiani v. Astrue*, 2010 WL 474642 (E.D.N.Y. Feb. 5, 2010), ALJ Strauss

denied benefits to a claimant who had worked for twenty-seven years as a secretary before

being hit by a truck as a pedestrian.  In the process, ALJ Strauss decided that claimant's treating

physicians' opinions were "not entitled to controlling weight, or even significant weight."  That

is, except for a single cherry-picked statement by claimant's longtime rheumatologist – which

was only entered into evidence as hearsay by a state agency medical consultant – that claimant

had some basic movement left in her hands.  "Inexplicably," this Court noted, ALJ Strauss gave

significant weight to this secondhand statement "even as she virtually disregarded [the treating

physician's] own firsthand assessments."  The Court saw no reason to remand for a

determination of disability because ALJ Strauss "lacked good reasons for refusing to give

controlling weight to [the treating physician's] assessment of [claimant's] ability to work."

Instead, "rather than subject [claimant] once again to the painfully slow process by which

disability determinations are made, the case [was] remanded solely for the calculation of

benefits."

211.    In *LoRusso v. Astrue*, 2010 WL 1292300 (E.D.N.Y. Mar. 31, 2010), ALJ Strauss

again refused to give significant weight to claimant's treating physician.  Instead, she favored

the opinions of two consulting physicians who each had only examined the plaintiff one time

over a year before claimant underwent subsequent surgeries that confirmed her treating

physician's diagnosis.  This Court stated that it was "puzzled" and "surprised (to say the least)

that ALJ Strauss continued to assign any weight, let alone significant weight, to [the consulting

physicians'] opinions."  The Court found ALJ Strauss's failure to explain the lack of weight

given to the plaintiff's treating physicians "particularly troubling" because explicit instructions

to do so had been given on a previous remand. These repeated failures to follow instructions on

remand "frustrated the entire point of the remand" and "rendered remand unproductive." In

sum, "ALJ Strauss misapplied several legal standards" and "her finding as to [claimant's]

residual capacity function [was] not supported by substantial evidence." The Court noted that

"it is regrettable . . . that this matter must be returned to the Commissioner for a third review."

However, the record was too incomplete for the Court to rule that claimant was disabled.

Accordingly, the Court again issued explicit instructions about how to properly weigh the

opinions of a treating physician and remanded the case. Because it had been nearly nine years

since claimant had filed her initial application, the Court urged the Commissioner "to reach a

decision on her claim expeditiously."

212.    In *Martinez v. Astrue*, 2010 WL 5126224 (E.D.N.Y. Dec. 9, 2010), this Court

criticized ALJ Strauss for making a "determination [that] is neither supported by substantial

evidence nor based upon the correct legal standards." ALJ Strauss's opinion was "not based

upon a medical assessment of plaintiff's physical limitations. Instead, the ALJ based her

determination on her own evaluation of the medical findings in the record, committing legal

error." For example, ALJ Strauss asserted that there was no evidence that claimant suffered

spasms or a decreased range of motion due to her back problems, an assertion directly

"contradicted by the record." Indeed, ALJ Strauss completely disregarded any evidence of

claimant's back pain and, incredibly, ruled that claimant could perform any of her previous

jobs. The Court remanded the case and ordered an expedited hearing.

213.    In *Patel v. Astrue*, 2010 WL 5125986 (E.D.N.Y. Dec. 10, 2010), ALJ Strauss

again failed to comply with the Treating Physician Rule. The Court stated that ALJ Strauss had

wrongly discounted the opinion of claimant's treating physician of fourteen years in a "cursory way" although the physician "emphatically and consistently" maintained that claimant was fully disabled.  The Court noted that "[t]he ALJ explained away as 'uncorroborated by objective testing' a handful of diagnoses (including one in which there was an MRI) and ignored the rest."  It further stated that "ALJ Strauss should have discussed, or at least acknowledged" the occasions on which claimant's doctor had diagnosed her.  Because ALJ Strauss "nowhere interact[ed] substantively with [the treating physician's findings]" the court remanded the case, finding that ALJ Strauss's decision was "fatally flawed."

214.    In *Pluck v. Astrue*, 2011 WL 917654 (E.D.N.Y. Mar. 9, 2011), after more than six years and multiple hearings and remands, ALJ Strauss denied claimant benefits.  Claimant appealed to the district court, which once again remanded due to legal errors.  This Court noted that ALJ Strauss had misapplied the Treating Physician Rule by disregarding the testimony of two doctors who had seen claimant on dozens of occasions.  In typical fashion, she instead favored a consulting doctor who testified as an expert at the hearing.  The Court noted that the consulting doctor "did not provide any reasoning to support his conclusions, but the ALJ nonetheless adopted them at face value."  Moreover, ALJ Strauss adopted them despite "so many observations in the records of [claimant's] treating physicians, which went unexplained or unacknowledged in her decision."  In essence, ALJ Strauss had "incorrectly sifted through [the] evidence and referenced only those items that contradicted [claimant's] account."  This "selective reading of the evidence was improper."  By ignoring evidence that supported claimant's treating physicians, ALJ Strauss "disregarded her obligations to make 'every reasonable effort' to understand the bases of [the treating physician's] opinion."  Moreover, she

"insufficiently explained" her disregard of the treating physicians' opinions.  Instead, ALJ Strauss simply "ignore[ed]" the "observations that did not square with her conclusions."

### (3)    Erroneous Credibility Determinations

215.    In several cases, this Court found ALJ Strauss in error for making adverse credibility findings against claimants, including by consistently disregarding claimants' descriptions of the pain endured because of their disabling conditions.  Below are several notable examples, demonstrating a clear pattern between 2008 and the present:

216.    In *Harris v. Astrue*, 2008 WL 5517087 (E.D.N.Y. Jan. 20, 2008), this Court ordered ALJ Strauss to "revisit [her] adverse credibility determination with closer attention to the record."  The Court specifically noted that ALJ Strauss characterized claimant as able to cook food and visit friends despite claimant's testimony that she "really 'no longer cook[s]'" and that she only went out once a month with her significant other and otherwise had no friends.  The Court stated that ALJ Strauss had the duty to engage in a "meticulous review of the testimony and record," but "[t]here is reason to believe that such a review was lacking here."

217.    In *Scandura v. Astrue*, 2009 WL 648611 (E.D.N.Y. Mar. 10, 2009), ALJ Strauss had twice denied benefits to a claimant who had testified that she was "racked with pain throughout [her] body" and whose treating physician rated her "constant" pain level "at a 10 on a 10-point scale."  This Court criticized ALJ Strauss's credibility determination as "an attempt by the ALJ to substitute her own judgment for that of [the treating physicians]."  Not only did ALJ Strauss "set[] the bar too high" by requiring claimant to "peg her subjective complaints to objective evidence," but she created a "Catch-22 situation" in which the "plaintiff would have virtually no *objective* way to demonstrate the veracity of her own subjective complaints."

218.    In *Wilkins v. Astrue*, 2009 WL 1262380 (E.D.N.Y. May 8, 2009), this Court remanded the case because ALJ Strauss "improperly disregarded [claimant's] complaints of severe pain." ALJ Strauss had relied on apparent contradictions in claimant's testimony to attack her credibility. However, upon reviewing the record, the Court found "no reason to doubt [claimant's] credibility."

219.    In *Primiani v. Astrue*, 2010 WL 474642 (E.D.N.Y. Feb. 5, 2010), ALJ Strauss assumed that claimant must have testified falsely about her pain because she drove her daughter to school, cooked, and cleaned. This Court disagreed, stating that "[t]hese functions are life's necessities, and [claimant] a single mother, has no one else to do them for her. That she manages to accomplish them (with the help of 200 pills per month) does not make it likely that she lied about the pain she endures." ALJ Strauss further erred by finding claimant's testimony not credible despite evidence that "strongly suggest[ed] a determination to work for as long as [claimant] could." In light of these egregious errors, the Court remanded solely for the calculation of benefits.

220.    In *LoRusso v. Astrue*, 2010 WL 1292300 (E.D.N.Y. Mar. 31, 2010), ALJ Strauss ignored explicit instructions from a previous remand by failing to consider several surgeries when determining that claimant's complaints of pain were not credible. In fact, ALJ Strauss failed to provide any reason for finding that claimant lacked credibility, which "fatally undermine[d] [her] argument that there is substantial evidence adequate to support h[er] conclusion that claimant is not under a disability" and therefore warranted remand.

221.    In *Pena v. Comm'r of Soc. Sec.*, 2010 WL 4340449 (E.D.N.Y. Oct. 22, 2010), ALJ Strauss once again committed "legal error" when she failed to "properly evaluate [claimant's] subjective testimony concerning her disability." Specifically, she ignored

claimant's medication regime, non-pharmaceutical treatments, and other factors claimant testified to concerning the severity of her condition.

222.    In *Canton v. Astrue*, 2010 WL 5391184 (E.D.N.Y. Dec. 22, 2010), this Court remanded because ALJ Strauss improperly analyzed claimant's credibility by failing to "take into account any precipitating and aggravating factors, such as [claimant's] diabetes" when analyzing claimant's subjective complaints of pain.

223.    In *Pluck v. Astrue*, 2011 WL 917654 (E.D.N.Y. Mar. 9, 2011), ALJ Strauss "erred in using isolated events" to discredit claimant's account of her limitations.  For example, ALJ Strauss relied on evidence that claimant had made several attempts to return to work as an indication that claimant was not disabled at all during the thirteen-year period of claimed disability.  The Court noted that these were best characterized as "unsuccessful work attempt[s]" that did not prove claimant was not disabled.  ALJ Strauss had "effectively penalized [claimant] for returning to work when she was able."

### (4)    High Denial Rate

224.    Disposition data for 2005-2008 shows that ALJ Strauss denied 69% of the claims before her, a rate 41 percentage points higher than the national average.  In fact, ALJ Strauss was in the top 2% of deniers nationally for that period.

225.    More recent data confirms this stunning trend has continued, as ALJ Strauss's denial rate for the period between September 25, 2010 and March 25, 2011 (the most recent reporting period for SSA) has bloated to an alarming rate of 77%.

226.    When considered in the context of ALJ Strauss's routine and consistent failure to follow legal rules, egregious reversal rate, and severe criticisms by federal courts, the denial rates constitute unmistakable circumstantial evidence of bias and gross incompetence.

2.      **Commissioner's Indifference**

227.    The Commissioner is aware or should have been aware, based on complaints, errors presented on appeal to his own Appeals Council and the district courts, and statistics, that the Named ALJs are biased against people with disabilities and claimants generally, and exhibit the sort of routine errors that constitute gross incompetence.

228.    The Commissioner is also aware or should have been aware, based on statistics, complaints, and errors presented on appeal to his own Appeals Council and the district courts, that the Named ALJs routinely refuse to apply Social Security law and regulations in rendering their decisions.

229.    The Commissioner has failed to take adequate steps to prevent the Named ALJs from failing to provide fair hearings, or from rendering decisions based on bias.

230.    Indeed, it was only on February 23, 2010 that the Commissioner issued public notice of intent to establish a new system of records and routine uses entitled "Administrative Law Judge/Public Alleged Misconduct Complaints System" to manage and monitor complaints. In his announcement, the Commissioner acknowledged, "[a]t present, we do not have a good mechanism to track complaints about ALJs from initiation to resolution."

231.    The absence of a "good mechanism" to cure and remediate gross incompetence, and guard against ALJs exhibiting generalized bias against claimants, is particularly evident in QODAR: of the 72 cases in which the Named ALJs were identified by this Court in the period between January 2008 and the present, the Named ALJs were remanded for routine legal error in 80% of those cases.  This shocking statistic means that disability claimants from Queens face an even greater harm than those in districts where a single ALJ has been identified as exhibiting incompetent or generally biased conduct. *Pronti v. Barnhart*, 339 F. Supp. 2d 480, 497

(W.D.N.Y. 2004); *Grant v. Comm'r of Soc. Sec.*, 111 F. Supp. 2d 556, 568 (M.D. Pa. 2000);

*Crisci v. Shalala*, 169 F.R.D. 563 (S.D.N.Y. 1996); *Small v. Sullivan*, 820 F. Supp. 1098 (S.D.

Ill. 1992); *Small v. Sullivan*, 1992 U.S. Dist. LEXIS 21594 (S.D. Ill. July 2, 1992); *Kendrick v.

Sullivan*, 784 F. Supp. 94, 103 (S.D.N.Y. 1992); *Hummel v. Heckler*, 736 F.2d 91, 93 (3d Cir.

1984).

       **3.**     **Lack of Accountability to the Public**

232.     Absent this Court's intervention, the Named ALJs have no direct accountability

to the public. Pursuant to 5 U.S.C. § 7521, only agencies are allowed to take action against

ALJs for good cause established and determined by the Merit Systems Protection Board after a

hearing, and, upon information and belief, the Commissioner has not taken any action against

any of the Named ALJs despite the long history of mistreatment and bias by the Named ALJs.

233.     Additionally, pursuant to the SSA's Office of Hearings and Appeals (Now

ODAR), *Hearings, Appeals and Litigation Law Manual*, at I-2-0-5.A (updated, Sept. 28, 2005),

it is the responsibility of the Hearing Office Chief ALJ to "participate[] in investigations, in

coordination with the Regional Chief Administrative Law Judge, into allegations of misconduct

on the part of any employee, including ALJs . . . [and to] ensure[] the timely and accurate

response to public and congressional inquiries; . . . and conduct[] periodic training."

Accordingly, under the current paradigm for investigation of wrongdoing, one of the primary

offenders – Chief ALJ Nisnewitz – would be responsible for participating in investigations into

the very misconduct of which he is accused.

234.     Without the intervention of this Court, there is no practical means for the public

generally, and the plaintiffs and class members particularly, to hold the Named ALJs

accountable for their actions and to obtain the necessary relief from unfair hearings and decisions based on bias.

### 4.   **Bias Toward Class Plaintiffs Specifically**

235.   As detailed below, each of the Class Plaintiffs has experienced one or more of the very errors which this Court has had to correct time after time after time with the Named ALJs.  Most commonly, Class Plaintiffs have experienced the Named ALJs' clear and systematic failure to abide by the Treating Physician Rule.  Many have also suffered from the Named ALJs' dereliction of duty to develop the record and support their conclusions with cogent explanation and evidence.  Many have suffered erroneous adverse credibility determinations.  Some have suffered from more obvious bias, hostility and unprofessional behavior (which is indicative of bias).  There is little doubt, when the overall record is considered, that Class Plaintiffs have experienced the same pattern of bias identified above.

### a)   **Plaintiff Leslie Bailey**

236.   Ms. Bailey's case was heard by Chief ALJ Nisnewitz.  ALJ Nisnewitz's decision denying benefits to Ms. Bailey was premised on several errors, including failure to abide by the Treating Physician Rule, failure to develop the record, erroneous credibility determinations, and failure to support conclusions with substantial evidence.

237.   **Background Facts:**  Ms. Bailey, born April 8, 1960, is a 51-year-old woman who lives in Springfield Gardens, New York, and who worked for the New York City Fire Department for 15 years.  Ms. Bailey was injured in a car accident on July 31, 2004 and was unable to engage in any substantial gainful activity until November 6, 2006, when she attempted to return to work.  This attempt ended unsuccessfully on April 28, 2007, after she committed

several errors on account of her disability. Since then, she has continued working at her job as fire dispatcher only with substantial accommodations from her employer.

238. **Disabilities:** Ms. Bailey suffers from fibromyalgia developed from her motor vehicle injuries. This condition causes Ms. Bailey constant pain in her back, legs, and upper body, fatigue, and disturbed sleep.

239. **Procedural History:** On August 13, 2007, Ms. Bailey appealed ALJ Nisnewitz's June 2007 decision denying her SSD benefits to the Appeals Council. The Appeals Council vacated and remanded ALJ Nisnewitz's decision for failure to follow the Treating Physician Rule. On September 24, 2009, ALJ Nisnewitz denied Ms. Bailey's application for a second time, and on September 30, 2009, Ms. Bailey again appealed the decision to the Appeals Council. After the Appeals Council declined review of ALJ Nisnewitz's decision, Ms. Bailey filed a complaint in United States District Court for the Eastern District of New York on March 2, 2010. Her case is currently pending before District Court Judge Irizarry.

240. **Errors:** ALJ Nisnewitz's second decision was premised on the following errors:

a. **Treating Physician Rule:** ALJ Nisnewitz disregarded the testimony of Ms. Bailey's treating physician, despite his report being consistent with the evidence in the record and "well-supported by medically acceptable clinical and laboratory diagnostic techniques." Indeed, the report was based, in part, on the documentation of ACR trigger points, the only generally accepted standard in the medical community for diagnosing fibromyalgia. Nevertheless, ALJ Nisnewitz determined the treating physician's opinion was not buttressed by medical, diagnostic, or clinical findings. Likewise, ALJ Nisnewitz complained of an absence of objective evidence to support the diagnosis. However, the Second Circuit has noted on numerous occasions that objective evidence is irrelevant to a fibromyalgia diagnosis. ALJ

Nisnewitz cherry-picked pieces of the ME's testimony that supported his predetermined conclusion that Ms. Bailey should be denied benefits, while ignoring the ME's testimony that he could not dispute the treating physician's diagnosis of fibromyalgia.

b.    **Failure to develop the record:**  ALJ Nisnewitz discounted the treating physician's opinion, in part, because of supposed inconsistencies in the doctor's reports. However, contrary to the Appeals Council's direction, not once did ALJ Nisnewitz attempt to contact the doctor for an explanation of the alleged inconsistencies.  Similarly, ALJ Nisnewitz repeatedly interrupted and obstructed Ms. Bailey's cross-examination of the ME.  When Ms. Bailey pointed out that the Appeals Council directed ALJ Nisnewitz to obtain additional evidence, the ALJ replied, "**I don't care what the Appeals Council said.**"

c.    **Erroneous credibility determination:**  ALJ Nisnewitz asserted Ms. Bailey lacked credibility without any legitimate basis.  This decision was clear error— particularly in light of Ms, Bailey's strong fifteen-year work record with the Fire Department, which under well-settled law entitles her to a presumption of credibility.  ALJ Nisnewitz used his own rejection of the treating physician's opinion as a basis for attacking the credibility of claimant's testimony regarding the severity of her symptoms.  Likewise, he made up facts to support his conclusions.  For example, he claimed the doctor did not restrict Ms. Bailey from performing at least sedentary work and that she was able to perform self-care activities.  Neither of these facts were true or on the record, however.

d.    **Failure to support conclusion with substantial evidence:**  ALJ Nisnewitz also erred as a matter of law in finding that Ms. Bailey could perform a full range of sedentary work.  As a result of her condition, Ms. Bailey has only been able to continue in her position as a fire dispatcher with special accommodations from her employer.  But, ALJ

Nisnewitz manipulated the Vocation Expert's ("VE") testimony regarding her residual functional capacity. He repeatedly interrupted when the VE was asked if Ms. Bailey could continue to work without the accommodations. Eventually, the VE confirmed that a person in Ms. Bailey's condition could not perform Ms. Bailey's job absent the frequent breaks her employer provided her. Nevertheless, ALJ Nisnewitz disregarded the VE's testimony and concluded without any evidence or explanation that Ms. Bailey *could* perform her job *absent* accommodations.

> e.    **Other errors:** By ignoring the bulk of the evidence supporting disability, ALJ Nisnewitz also failed to apply the preponderance of the evidence standard in rendering his decision. ALJ Nisnewitz also disregarded explicit instructions from the Appeals Council on remand.

> b)    <u>**Plaintiff Marie Thelot**</u>

241.    Ms. Thelot's case was heard by ALJ Hoppenfeld. ALJ Hoppenfeld's decision denying benefits to Ms. Thelot was premised on several errors, including failure to abide by the Treating Physician Rule, failure to develop the record, erroneous credibility determinations, and failure to support conclusions with substantial evidence.

242.    <u>**Background Facts**</u>: Ms. Thelot, born November 21, 1964, is a 46-year-old woman who lives in Jamaica, New York. She has been unable to work since May 1, 2003, and has not engaged in substantial gainful activity since at least that date. She previously worked as a physical therapist assistant after immigrating to the U.S. from Haiti in 1983.

243.    <u>**Disabilities**</u>: Ms. Thelot suffers from fibromyalgia, chronic fatigue syndrome, and degenerative joint disease. These conditions cause Ms. Thelot constant disabling pain and fatigue throughout her body.

244.   **Procedural History:**  On January 10, 2008, ALJ Hoppenfeld heard Ms. Thelot's

first appeal from a denial of benefits and on June 25, 2008, she denied Ms. Thelot's application.

On August 8, 2008, Ms. Thelot requested that the Appeals Council review ALJ Hoppenfeld's

decision, and on September 25, 2008, the Appeals Council remanded the case to ALJ

Hoppenfeld due to her failure to apply the Treating Physician Rule.  On May 18, 2010, ALJ

Hoppenfeld denied Ms. Thelot's claim yet again.  On May 23, 2010, Ms. Thelot requested that

the Appeals Council review ALJ Hoppenfeld's decision and disqualify ALJ Hoppenfeld for

bias.  To date, Ms. Thelot has not received a decision on this request.

245.   **Errors:**  ALJ Hoppenfeld's decision was premised on the following errors:

a.      **Treating Physician Rule:**  After the Appeals Council explicitly

instructed ALJ Hoppenfeld to evaluate the opinions of Ms. Thelot's five treating physicians on

remand, ALJ Hoppenfeld ignored the Appeals Council's order and declined to follow the

Treating Physician Rule.  All five of Ms. Thelot's treating physicians, including an expert

rheumatologist, concluded that Ms. Thelot suffers from severe fibromyalgia and lacks the

functional capacity to perform sedentary work.  Nevertheless, ALJ Hoppenfeld discounted this

overwhelming medical evidence, claiming that the rheumatologist's report was "contrary to the

examination findings" and conflicted with the opinions of the ME.  This determination

contained serious legal and factual errors.  It failed to give the doctors' diagnosis controlling

weight despite their reports being consistent with the evidence in the record and "well-supported

by medically acceptable clinical and laboratory diagnostic techniques."  Indeed, the treating

physicians' reports were based, in part, on the documentation of ACR trigger points, the only

generally accepted standard in the medical community for diagnosing fibromyalgia.  The ME, a

psychiatrist, disregarded this crucial diagnostic tool.

b.      **Failure to develop the record:**  ALJ Hoppenfeld discounted the rheumatologist treating physician's opinion, in part, because of alleged discrepancies between his notes and his report prepared for the hearing.  However, ALJ Hoppenfeld never asked the treating physician to clarify the discrepancy as was required under the Treating Physician Rule.

c.      **Failure to support conclusion with substantial evidence:**  ALJ Hoppenfeld also erred as a matter of law by finding that Ms. Thelot could perform light work.  Light work is defined as the ability to stand for at least 6 hours out of an 8-hour work day and to lift up to 20 pounds.  ALJ Hoppenfeld failed to consider the impact of Ms. Thelot's fibromyalgia, which causes her constant debilitating pain rendering her incapable of working.

d.      **Erroneous credibility determination:**  ALJ Hoppenfeld asserted Ms. Thelot lacked credibility without any legitimate basis.  Her bald conclusion did not identify a single supporting fact other than the ME's claim that an examination was needed to rule out contrivance and manipulation.  However, the ME merely requested an examination, and did not claim that Ms. Thelot was contriving or manipulating her pain.  Likewise, ALJ Hoppenfeld inaccurately claimed that Ms. Thelot's treating physician questioned her credibility.  That assertion was patently false.

e.      **Other errors:**  By ignoring the bulk of the evidence supporting disability, including the findings of five treating physicians and an expert rheumatologist finding that Ms. Bailey is disabled, ALJ Hoppenfeld failed to apply the preponderance of the evidence standard in rendering her decision.  ALJ Hoppenfeld also disregarded specific instructions from the Appeals Council on remand.

c)     **Plaintiff Sarah Rodriguez**

246.   Ms. Rodriquez's case was heard by ALJ Cofresi.  ALJ Cofresi's decision to deny benefits was premised on several errors, including failure to abide by the Treating Physician Rule, an erroneous and faulty credibility determination, and failure to support his conclusions with substantial evidence.

247.   **Background Facts:** Ms. Rodriguez, born December 12, 1967, is a 43-year-old resident of Long Island City, where she lives with her 13-year-old daughter.  She has a 10th-grade education.  Depression and anxiety have interfered with Ms. Rodriguez's functioning since the mid-1990s and rendered her unable to sustain full-time employment.  Her attempts to obtain a GED have also failed due to her disability.

248.   **Disabilities:** Ms. Rodriguez has a long history of severe anxiety, obsessive thinking, and depression.  She was hospitalized for depression when she was in her early 20s, and has been in psychiatric treatment consistently since 1999.  Her treating psychiatrist and psychologist have found that Ms. Rodriguez is particularly impaired in vocational settings, that she had a marked inability to deal with customary work pressures, and that she would only be able to sustain full-time work if it were in a supportive setting with accommodations for her mental limitations and inability to deal with ordinary workplace stress or criticism.

249.   **Procedural History:** Ms. Rodriguez applied for SSI in 2007 and was denied.  A hearing was held before ALJ Cofresi, who issued a decision, dated September 25, 2009, denying benefits.  Ms. Rodriguez appealed to the Appeals Council, which remanded the claim with instructions to further evaluate Ms. Rodriguez's mental impairments, give further consideration to her residual functional capacity ("RFC"), and obtain VE testimony.  A hearing is scheduled before ALJ Cofresi on July 11, 2011.  Although the Appeals Council instructions

on remand directed only VE testimony, ALJ Cofresi has also requested the testimony of an ME at the hearing.

250.   **Errors:**  ALJ Cofresi's decision was premised on the following errors:

a.   **Treating Physician Rule:**  ALJ Cofresi ignored the opinions of a treating psychiatrist and treating psychologist, who, as a team, had treated Ms. Rodriguez approximately biweekly for more than ten years.  In opining that Ms. Rodriguez was disabled, the doctors made detailed findings about Ms. Rodriguez's difficulties in a workplace setting, noting that she has marked limitations in her ability to handle customary work pressures and to respond appropriately to co-workers.  They noted her interpersonal difficulties as being *especially* severe in the vocational setting, finding that she is "extremely vigilant and uneasy in interpersonal, evaluatory settings – e.g. work environment," that this difficulty has impeded her performance and ability to function in a work setting, and that she may only be able to work if provided with supports and accommodations.  ALJ Cofresi failed to properly apply the Treating Physician Rule and neglected to consider all of the relevant factors, including length, nature, and frequency of treatment, or its consistency with the record as a whole.

b.   **Failure to support conclusions with substantial evidence:**  ALJ Cofresi's rejection of the treating physician evidence was unsupported by substantial evidence. Instead, he used attenuated logic to conclude that the physicians' findings that Ms. Rodriguez had a marked limitation in dealing with co-workers and customary work pressures were inconsistent with their separate finding that she had moderate-level impairments in her overall social functioning because the categories were "directly related."  Of course, the ability to deal with co-workers and supervisors in a work setting may be a subset of a broader category of dealing with people.  ALJ Cofresi then used even more severely attenuated logic to conclude

that her doctors' opinions were inconsistent with their findings that Ms. Rodriguez was consistently alert and oriented to person, place and time with good insight, judgment and impulse control with no suicidal or homicidal ideation and no evidence of hallucinations. In order to support the finding of inconsistency, ALJ Cofresi opined that the awareness of time and place and the absence of suicidal and homicidal ideation negate findings of disability – an absurd conclusion.

      c.    **Erroneous credibility determination:** ALJ Cofresi's credibility determination included improper findings that Ms. Rodriguez's ability to engage in ordinary daily activities and care for her child independently was evidence that disproved her claim of "total disability." The conclusion was flawed for its reference to "total disability" as the standard. It was also inconsistent with the law, which provides that those types of daily activities do not prove a person can work.

      d.    **Other errors:** ALJ Cofresi's findings – especially his reliance on the negative mental status exam findings – constitute the selective and misleading use of evidence and a substitution of his medical opinion for that of the treating physicians. His conclusion that Ms. Rodriguez was capable of "low-stress" work – which is belied by her treating physicians – was flawed for his failure to support it with a subjective, individualized inquiry into the nature of her non-exertional limitations. Also, by ignoring the bulk of evidence supporting disability, he failed to apply the correct standard of evidence.

      **d)**    **Plaintiff Lorraine Padro**

    251.    Ms. Padro's case was heard by ALJ Hoppenfeld. ALJ Hoppenfeld's decision denying benefits to Ms. Padro was premised on several errors, including failure to abide by the

Treating Physician Rule, erroneous and faulty credibility determinations, and failure to support conclusions with substantial evidence.

252.   **Background Facts:**   Ms. Padro, born January 12, 1969, is a 42-year-old woman who lives with a family friend in a basement in Ozone Park, New York.  She has been unable to work since July 15, 2006, and has not engaged in substantial gainful activity since at least that date.  She receives public assistance.  Ms. Padro has a sixth-grade education, and her subsequent attempts to obtain a high school equivalency diploma were unsuccessful.  Ms. Padro has limited ability to read and write and can only perform addition.  Her work history has included positions as a cleaner for a fast food restaurant and as a clerical worker.

253.   **Disabilities:**   Ms. Padro suffers from several disabling conditions, including diabetes (and associated obesity), asthma, major depressive disorder with psychotic and anxious features, bipolar disorder, chronic low back pain, migraine headaches, and radiculopathy.  Her benefits application focused on her well-documented and severe mental illness, which, in the words of one of her treating physicians made her "unemployable."  Indeed, after trying to place her in a number of positions, the New York City Human Resources Administration ("HRA") exempted Ms. Padro from participating in its work programs because of her physical and psychiatric conditions.

254.   **Procedural History:**   On August 6, 2007, Ms. Padro applied for SSI.  After the Commissioner denied her application, Ms. Padro appealed the denial of benefits on July 24, 2009.  ALJ Hoppenfeld held a hearing and issued a decision on January 19, 2010, denying Ms. Padro disability benefits.  The Appeals Council denied Ms. Padro's request for review, and, on July 23, 2010, she appealed the denial in the U.S. District Court for the Eastern District of New

York.  Only then, *the Commissioner conceded error by ALJ Hoppenfeld*, and urged remand

rather than a court-directed award of benefits.

255.  **Errors:**  ALJ Hoppenfeld's decision was premised on the following errors:

a.  **Treating Physician Rule:**  As conceded by the Commissioner upon

appeal to this Court, ALJ Hoppenfeld ignored the requirements of the Treating Physician Rule.

b.  **Failure to support conclusion with substantial evidence:**  ALJ

Hoppenfeld based her decision on a central conclusion:  that Ms. Padro had the RFC to perform

low-stress, repetitive, and unsupervised work that did not bring her into close proximity with

others, a finding that was unsupported by substantial evidence and failed to consider the bulk of

the evidence indicating a far greater number and degree of functional limitations.  ALJ

Hoppenfeld had posed a series of questions to the VE to consider a hypothetical worker with

that RFC.  In relying on the VE's testimony that a hypothetical person with the given RFC

could perform such work, ALJ Hoppenfeld failed to consider, or even address, the bulk of the

evidence, including the opinion of Ms. Padro's treating physicians, as well as HRA's

determination that Ms. Padro's physical and psychiatric impairments made her unsuitable for

employment.

c.  **Erroneous credibility determination:**  ALJ Hoppenfeld noted, in

assessing Ms. Padro's testimony, the "many inconsistencies in this record, which makes

claimant's allegations suspect, questionable and unable to be accepted."  However, this

credibility determination was based on cherry-picked evidence and erroneous presumptions.

ALJ Hoppenfeld failed to address, or even mention, the severe mental illness that gave rise to

some of the inconsistencies upon which she focused as a basis to discredit Ms. Padro.

d. **Other errors:** By ignoring the bulk of the evidence supporting disability, including the findings of four treating physicians that Ms. Padro is disabled, and the partial findings of the Commissioner's consultative examining physicians, ALJ Hoppenfeld also failed to apply the preponderance of the evidence standard in rendering her decision. In various ways, it is clear that, in rendering her decision, ALJ Hoppenfeld was preoccupied by Ms. Padro's history of child custody proceedings and prior drug dependency, asking extensive questions about her children, and requesting detailed information about the exact method for using crack cocaine. ALJ Hoppenfeld also repeatedly substituted her own medical opinion, often to absurd conclusions, such as suggesting that Ms. Padro's diabetes-related foot injury was brought on by drug use.

### e) **Plaintiff Dhanasar Raman**

256. Mr. Raman's case was heard by ALJ Strauss. ALJ Strauss's decision denying benefits to Mr. Raman was premised on several errors, including failure to abide by the Treating Physician Rule, failure to develop the record, erroneous credibility determinations, and failure to support conclusions with substantial evidence.

257. **Background Facts:** Dhanasar Raman, born July 4, 1960, is a 50-year-old resident of South Ozone Park, New York. Mr. Raman attended school up through the 5th grade in his native Guyana, and previously worked as a machinist.

258. **Disabilities:** Dhanasar Raman suffers from cervical dystonia, a painful disorder of involuntary muscle contractions causing sustained twisting movements and abnormal posture. Both Mr. Raman's neck and upper torso are severely twisted to the right. This twisting affects his posture in that his upper lumbar spine tilts to the left. His right shoulder is positioned higher than his left shoulder and Mr. Raman is neither able to rotate his spine to the left nor

bend to the left.  His condition also affects his gait, because Mr. Raman must torque his upper

body back to the right to see where he is going.  His balance is also affected, his heel-to-toe

walking is difficult, and he is unable to squat.  Mr. Raman also suffers herniated discs in his

cervical spine due to his condition.

259.   **Procedural History**:  On December 5, 2007, Mr. Raman applied for SSI and

SSD benefits.  His initial application was denied on June 6, 2006.  Mr. Raman appealed the

denial of benefits, and a hearing was held before ALJ Strauss.  On February 25, 2010, ALJ

Strauss denied disability benefits to Mr. Raman.  On May 3, 2010, Mr. Raman requested that

the Appeals Council review ALJ Strauss's decision, but to date he has not received a decision

on this request.

260.   **Errors**:  ALJ Strauss's decision was premised on the following errors:

a.   **Treating Physician Rule**:  ALJ Strauss discounted the reports of Mr.

Raman's treating physician finding Mr. Raman totally disabled because it allegedly lacked

clinical findings and relied on subjective complaints of neck pain.  This determination contained

serious legal and factual errors as it failed to give the doctor's diagnosis and prognosis

controlling weight, despite the report being consistent with the evidence in the record and "well-

supported by medically acceptable clinical and laboratory diagnostic techniques."  Indeed, the

treating physician's report was based, in part, on two MRI scans and an EEG, as well as a

physical examination of Mr. Raman.  ALJ Strauss also discounted a second medical report

proffered by a treating physician.  In that instance, ALJ Strauss offered opaque and inconsistent

grounds for her dismissal of the report.  ALJ Strauss also ignored medical evidence from an

MRI, dated June 6, 2005, which revealed herniated discs in the area of the cervical spine.

b.  **Failure to develop the record:**  ALJ Strauss failed to develop the record through the use of expert medical testimony before determining that Mr. Raman's impairments from cervical dystonia do not equal an impairment in the SSA's Listing.  Instead, ALJ Strauss conducted her own evaluation of the medical record, which overlooked almost all of the medical findings by Mr. Raman's treating physicians and ignored the serious effects of his condition which include:  permanent involuntary movement, interference with his ability to perform normal motor functions, hampered locomotion and limited use of his hands.  This failure by ALJ Strauss also ignores the requirement that a medical expert be employed for determinations of medical equivalence under the Listing.

c.  **Failure to support conclusion with substantial evidence:**  ALJ Strauss also erred as a matter of law by finding that Mr. Raman could perform light work.  Light work is defined as the ability to stand for at least 6 hours out of an 8-hour work day and to lift up to 20 pounds.  ALJ Strauss failed to consider the impact of Mr. Raman's dystonia, which affects Mr. Raman's gait and balance and causes his head to remain in the same right-facing position.  In addition, ALJ Strauss failed to account for the difficulty anyone would encounter in using both hands while their head is chronically turned.  This condition severely impacts Mr. Raman's ability to navigate the ordinary hazards of a typical working environment.  ALJ Strauss's conclusion that Mr. Raman's dystonia was found by his treating doctor to be "controlled" by Botox is based on a mischaracterization of the doctor's opinion, which read, in full, that "[Mr. Raman's] response to anti-seizure medication has been good.  However cervical dystonia remains his worse problem with associated muscle spasms/pain.  He is totally disabled."

d.  **Erroneous credibility determination:**  In rejecting Mr. Raman's request for benefits, ALJ Strauss questioned his credibility.  This was clear error—particularly in light

of Mr. Raman's strong 20-year work record, which under well-settled law entitles him to a

presumption of credibility.  Not surprisingly, ALJ Strauss's credibility determination is belied

by the nature of Mr. Raman's complaints, which are consistent with a diagnosis of cervical

dystonia.  Nonetheless, in an effort to support her own flawed conclusion, ALJ Strauss

questioned Mr. Raman's credibility because he failed to seek out physical therapy, a "work

hardening program," chiropractic treatment, or narcotic pain medication—none of which was

recommended by Mr. Raman's treating physicians.

> e.      **Other errors:**  By ignoring the bulk of the evidence supporting

disability, including two treating physicians finding Mr. Raman was disabled, ALJ Strauss also

failed to apply the preponderance of the evidence standard in rendering her decision.

> f)      <u>**Plaintiff Toby Marlow as Court-Appointed Guardian for Judith**</u>
>
> <u>**Blumensohn**</u>

261.     Ms. Blumensohn's case was heard by ALJ Nisnewitz.  In denying benefits to Ms.

Blumensohn, ALJ Nisnewitz failed to properly apply well-settled Social Security law.

262.     <u>**Background Facts:**</u>  Judith Blumensohn, born July 19, 1955, is a 55-year-old

woman who for the past year has been an in-patient at the Zucker Hillside Hospital, a

psychiatric hospital in Queens, New York.  She has no past relevant work experience and has

never engaged in substantial gainful activity.  Since 2002, Ms. Blumensohn has received SSI

disability benefits.

263.     <u>**Disabilities:**</u>  The Commissioner concedes that, since 2002, Ms. Blumensohn has

suffered from the severe mental impairment of schizophrenia.  At issue during Ms.

Blumensohn's hearing was whether Ms. Blumensohn's impairment began prior to her 22nd

birthday.

264.    **Procedural History:**  On October 23, 2006, Ms. Blumensohn filed an

application for DAC benefits, SSD benefits available under the Act to an unmarried child over

the age of 18 with a disability that began before age 22, based on a parent's Social Security

earnings record.  In her application, Ms. Blumensohn alleged that her severe mental illness

began when she was 12 years old—the age at which the Family Court in Kings County found

her to be a "person in need of supervision."  Ms. Blumensohn's application for benefits was

denied.  Ms. Blumensohn appealed the denial of benefits, a hearing was held before ALJ

Nisnewitz, and on February 10, 2009, he issued a decision rejecting Ms. Blumensohn's

contention that she was disabled prior to her 22nd birthday.  Ms. Marlow, as court-appointed

guardian for Ms. Blumensohn, filed an action in this Court on January 20, 2010 to review the

decision of the Commissioner, after which the Commissioner stipulated to a remand for further

proceedings.  On May 24, 2010, this Court entered a judgment reversing the decision and

remanding to the Commissioner with instructions to evaluate all evidence relevant to the period

at issue and to obtain medical expert testimony regarding the onset of disability.  On June 15,

2010, the Appeals Council remanded Ms. Blumensohn's case to ALJ Nisnewitz pursuant to this

Court's instructions.  A second hearing was held before ALJ Nisnewitz, and on October 22,

2010, ALJ Nisnewitz again rejected Ms. Blumensohn's contention that she was disabled prior to

her 22nd birthday.  Ms. Marlow appealed this final ruling to the U.S. District Court for the

Eastern District of New York, *pro se*, on February 17, 2011.

265.    **Error:**  In issuing both decisions, ALJ Nisnewitz erred by failing to correctly

apply Social Security Ruling 83-20, which instructs an ALJ to infer a mental illness onset date

prior to the actual start of recorded treatment, if such inference is consistent with available

evidence.  Despite this rule, and explicit instructions on remand, ALJ Nisnewitz refused to

permit an inference of disability which was supported by medical evidence and witness testimony, including:

- a Petition for Transfer dated May 2, 1969, when Ms. Blumensohn was 13 years old, indicating that she had been found to be "a person in need of supervision"[3] and placed at age 12 in the Pleasantville Cottage School by order dated December 12, 1967;

- a psychological report dated August 1, 1967, when Ms. Blumensohn was 12 years old, noting impulsivity, tendency to make loose, sweeping generalizations, constant ebullience, activity and energy, "tendency to blow up and dramatize much of what occurs," rapidly alternating moods, emotional lability and inclination to react histrionically to life experiences;

- a case summation dated May 12, 1969 describing Ms. Blumensohn's difficulties in school noted she was "a very deprived, depressed, impulse-ridden child"; and

- testimony provided by Ms. Marlow, Ms. Blumensohn's sister, indicating that Ms. Blumensohn had suffered from severe mental illness since childhood, and that the condition had prevented her from engaging in full-time work.

266.    Instead, ALJ Nisnewitz complained of a dearth of psychiatric treatment records prior to Ms. Blumensohn's 22nd birthday and rejected her claim for benefits.  ALJ Nisnewitz erred as a matter of law in this decision.  ALJ Nisnewitz's decision failed to apply the law with respect to onset date and consideration of lay evidence.  He also failed to apply the proper evidentiary standard, by denying Ms. Blumensohn's claim despite a preponderance of evidence that she was disabled by age 22.

### g)    Plaintiff Carmen Duran

267.    **Background Facts:**  Carmen Duran, born November 19, 1959, is a 51-year-old woman who lives in Richmond Hill, New York.  She has been unable to work since 1998,

---

[3]  A "person in need of supervision" is defined as "[a] person less than eighteen years of age who does not attend school in accordance with the provisions of part one of article sixty-five of the education law or who is incorrigible, ungovernable or habitually disobedient and beyond the lawful control of a parent or other person legally responsible for such child's care, or other lawful authority, or who violates the provision of section 221.05 of the penal law."  N.Y. Family Court Act, § 712(a).

which was the last time she engaged in substantial gainful activity.  Ms. Duran has a third-grade

education, meets the criteria for Listing of Impairments section 12.05 Mental Retardation, and

has an IQ measured in the 40s.  Ms. Duran reads at a second-grade level and has difficulty

communicating in English.  Her work history includes some factory work, applying price tickets

to clothing and babysitting.

268.   **Disabilities:**  Ms. Duran suffers from several disabling conditions, including

cognitive impairment, depression, post-traumatic stress disorder, adjustment disorder,

osteoarthritis and chronic back pain.

269.   **Procedural History:**  Ms. Duran first applied for SSI disability benefits on

June 30, 2006.  She appealed the denial of benefits on February 13, 2007.  ALJ Jay L. Cohen

held a hearing, after which he issued a decision finding that Ms. Duran was not disabled.  The

Appeals Council remanded the case for further proceedings on January 16, 2009, noting that

ALJ Cohen had not adequately evaluated the opinions of the treating and non-treating

physicians and had failed to adequately address Ms. Duran's claims of physical disability.  In

addition, ALJ Cohen did not consider the full range of factors when assessing Ms. Duran's

credibility.  On September 3, 2009, ALJ Hoppenfeld heard the case on remand, after which she

denied Ms. Duran benefits for a second time.  On November 24, 2010, Ms. Duran requested that

the Appeals Council review ALJ Hoppenfeld's decision, but to date she has not received a

decision on this request.

270.   **Errors:**  ALJ Hoppenfeld's decision was premised on the following errors:

a.       **Treating Physician Rule:**  ALJ Hoppenfeld failed to properly consider

the opinion of Ms. Duran's treating psychiatrist, Dr. Rodolfo Sandin, who submitted a report

stating that Ms. Duran experiences restriction of aptitudes needed for basic tasks associated with

holding a job such as cooperating with coworkers, responding to supervisors, maintaining regular attendance, being punctual within customary tolerances and performing at a consistent pace without an unreasonable number of rest periods. Despite these significant obstacles to employment, in rejecting Ms. Duran's benefits request, ALJ Hoppenfeld chose to cherry-pick one statement from the report which provided that Ms. Duran's speech was coherent, her affect and dress were appropriate, and she was oriented to person, place, and time.

b.   **Failure to develop the record:** Though the medical evidence conflicted, ALJ Hoppenfeld failed to complete the record by following up with Ms. Duran's treating physicians. Instead, she simply concluded that "the treating source did not supply sufficient basis for an inability to function." This failure to develop additional facts directly conflicts with the established requirements of a Social Security benefits hearing.

c.   **Erroneous credibility determination:** ALJ Hoppenfeld relied on the opinion of a consultative psychologist in concluding that Ms. Duran's testimony lacked credibility. To further support this vacuous conclusion, ALJ Hoppenfeld determined that Ms. Duran can manage money, care for children, travel, and maintain her household. This finding is fatally flawed. Indeed, Ms. Duran performs these functions *only* with supervision, sometimes from her 72-year-old mother, her children, or the home aide assigned to her household. In fact, Ms. Duran does not drive, she does not leave the house alone because her children fear that she will not remember to look both ways before stepping into the street; she does not even carry her own wallet, her children carry it for her.

d.   **Other Errors:** Stating that she did not "trust" the diagnosing facility, ALJ Hoppenfeld wrongly rejected the report of a New York State-licensed facility which concluded that Ms. Duran has cognitive deficiencies. Instead of relying on this fully acceptable

report, ALJ Hoppenfeld referred Ms. Duran to a consultative examiner who utilized a different and less comprehensive test to determine that Ms. Duran had greater cognitive abilities than she claimed. Notably, the particular test administered by the consultative examiner is expressly prohibited in New York State for the purpose of assessing cognitive abilities. Also, by ignoring the bulk of the evidence supporting disability, including two treating physicians finding Ms. Duran was disabled, ALJ Hoppenfeld also failed to apply the preponderance of the evidence standard in rendering her decision.

### h) **Plaintiff John Edwards**

271. Mr. Edwards's case was heard by ALJ Nisnewitz. ALJ Nisnewitz's decision, denying benefits to Mr. Edwards, was premised on several errors, including failure to abide by the Treating Physician Rule, failure to develop the record, erroneous adverse credibility determinations, and failure to support conclusions with substantial evidence.

272. **Background Facts**: John Edwards, born August 14, 1965, is a 45-year-old man with a ninth-grade education who lives alone in Brooklyn, New York. He has been unable to work since July 1, 2003, and has not engaged in substantial gainful activity since at least that date. When he was able to work, Mr. Edwards held the position of truck helper through which he assisted truck drivers in loading and unloading payloads, among other tasks. In performing this work, he engaged in frequent heavy lifting that caused certain of his medical problems.

273. **Disabilities:** Mr. Edwards suffers from multiple disabling conditions, including deteriorating herniated discs, which required surgical intervention and have caused extremely limited mobility and intense pain and radiculopathy, asthma, high cholesterol, depression, bipolar disorder, panic attacks and difficulty with memory and concentration. Mr. Edwards's depression prevents him from tolerating "even low stress jobs," as determined by his treating

physician.  Mr. Edwards also hears voices calling his name and telling him to sell drugs and rob people.

274.    **Procedural History:**  On January 27, 2006, Mr. Edwards applied for SSI benefits and was denied.  On August 1, 2006, Mr. Edwards appealed the denial of benefits.  ALJ Nisnewitz held a hearing on July 23, 2007, and on December 17, 2007, ALJ Nisnewitz rendered a decision finding Mr. Edwards not disabled.  Mr. Edwards requested review by the Appeals Council, which in turn vacated the decision and remanded the matter back to ALJ Nisnewitz, citing ALJ Nisnewitz's failure to abide by the Treating Physician Rule and his failure to adequately develop the record or support his conclusions.  ALJ Nisnewitz held a second hearing and, again, found Mr. Edwards not disabled.  On July 1, 2009, Mr. Edwards appealed the second decision by ALJ Nisnewitz to the Appeals Council, arguing that ALJ Nisnewitz failed to properly evaluate his psychiatric impairment and his work-related physical limitations, but the Appeals Council denied review and, on March 1, 2001, Mr. Edwards filed an appeal in this Court.

275.    **Errors:**  ALJ Nisnewitz's two decisions were premised on the following errors:

a.    **Treating Physician Rule:**  ALJ Nisnewitz ignored the requirements of the Treating Physician Rule by misstating the rule, and failing to accord controlling weight to Mr. Edwards's treating sources (or, in the alternative, explain the basis for declining to give controlling weight to the physicians' diagnoses).[4]

---

[4] ALJ Nisnewitz applied the Treating Physician Rule incorrectly by requiring that medical opinions be supported by objective evidence, such as laboratory results.  In fact, the rule is that treating physicians must be accorded controlling weight unless the opinions are substantially contradicted by the record evidence.

b.      **Failure to develop the record:**  Despite instructions from the Appeals Council to develop and consider evidence of Mr. Edwards's mental impairments, ALJ Nisnewitz again failed to develop this evidence on remand.  The Appeals Council also required ALJ Nisnewitz to give further consideration to Mr. Edwards's maximum residual functional capacity and, where necessary, to request additional medical evidence, or opinion clarification. ALJ Nisnewitz failed to do so a second time.

c.      **Failure to support conclusion with substantial evidence:**  Despite opinions from multiple treating sources finding Mr. Edwards disabled, and despite the presence of corroborating evidence, ALJ Nisnewitz cited a lack of objective evidence and adverse neurological findings to support his finding that Mr. Edwards was not disabled.  Not only were ALJ Nisnewitz's finding and rationale not supported by substantial evidence, they were also incorrect and misrepresented the record, which, in fact, did contain objective evidence to support his treating source opinions and Mr. Edwards's allegations, including the results of multiple MRIs with findings of herniated or bulging discs and scar tissue.  ALJ Nisnewitz's finding is also contrary to the law that objective evidence is not required.  Furthermore, he also concluded Mr. Edwards was capable of "low-stress" work – in contradiction to the findings of his treating physician – without undertaking a subjective, individualized inquiry into the nature of his non-exertional limitations.

d.      **Erroneous credibility determination:**  In assessing Mr. Edwards's testimony, ALJ Nisnewitz found that Mr. Edwards's subjective complaints about the persistence, intensity, and limiting effects of his symptoms were "not entirely credible." However, he did so without making *any evaluation* of Mr. Edwards's subjective complaints and

their impact on his residual functional capacity, as required by law, and despite instructions on remand from the Appeals Council.

e.    **Other errors:**  By ignoring the bulk of the evidence supporting disability, including the findings of four physicians that Mr. Edwards is disabled, ALJ Nisnewitz also failed to apply the preponderance of the evidence standard in rendering his decision.  Furthermore, in rejecting the opinion of Mr. Edwards's treating sources, by finding they "cannot be reconciled" with some of the findings made on neurological examination, ALJ Nisnewitz engaged in cherry-picking of evidence, and substituted his own medical conclusions for those of Mr. Edwards's treating physicians.

i)    **Plaintiff Ernesta Gutierrez**

276.    Ms. Gutierrez's case was heard by ALJ Cofresi.  ALJ Cofresi's decision, denying benefits to Ms. Gutierrez, was premised on several errors, including his failure to abide by the Treating Physician Rule, failure to consider the effect of claimant's impairments in combination rather than individually, erroneous adverse credibility determinations, and failure to support conclusions with substantial evidence.

277.    **Background Facts:**  Ms. Gutierrez, born November 7, 1966, has only a marginal education and is unable to communicate effectively in English.  She has been disabled since at least February 20, 2008 and has not engaged in substantial gainful activity since that date.  She had previously worked as a private housekeeper and assistant cook.

278.    **Disabilities:**  Ms. Gutierrez suffers from several disabling medical conditions, including low back pain, scoliosis, bilateral knee patello-femoral syndrome, bilateral shoulder rotator cuff tendinitis, vertigo/dizziness, insomnia and depressive disorder, among other problems.  Her treating psychotherapist opined that her mental illnesses make it impossible for

her to remember locations and work-like procedures, carry out short and simple instructions, or perform at a consistent pace without an unreasonable number of rest periods, all of which make it unrealistic for her to seek employment.

279.   **Procedural History:**  Ms. Gutierrez applied for SSI benefits on March 11, 2009. Her claim was initially denied and a hearing was held before ALJ Cofresi, who issued a decision finding Ms. Gutierrez ineligible for benefits.  On December 7, 2010, the Appeals Council denied Ms. Gutierrez's request for review.  On February 15, 2011, Ms. Gutierrez requested an extension of time from the Appeals Council to file an action in federal district court seeking the review of ALJ Cofresi's decision finding her not disabled within the meaning of the Act.

280.   **Errors:**  ALJ Cofresi's decision was premised on the following errors:

a.   **Treating Physician Rule:**  ALJ Cofresi failed to abide by the Treating Physician Rule.  Without explanation, he gave the opinions of Ms. Gutierrez's treating physician and psychotherapist little weight, and engaged in no analysis of the statutorily required factors for determining how much non-controlling weight should be given to the treating physicians' opinions.  ALJ Cofresi discounted these opinions largely because they did not reflect his own interpretation of the medical evidence, essentially substituting his own lay opinions for those of medical professionals.

b.   **Failure to consider impairments in combination:**  ALJ Cofresi improperly discounted the limiting effects of Ms. Gutierrez's impairments in part because he failed to consider the effect of her depression combined with her other impairments, as is required by Social Security law.

    c.      **Erroneous credibility determination:** ALJ Cofresi found that Ms. Gutierrez's description of her symptoms, including their intensity, persistence and limiting effects was not credible.  In reality, Ms. Gutierrez's statements were credible and consistent with objective medical evidence, which ALJ Cofresi ignored.  Further, even in the absence of objective medical evidence, ALJ Cofresi was under an obligation to consider Ms. Gutierrez's statements independently, and to provide reasons for his credibility determinations.  ALJ Cofresi did neither.

    d.      **Failure to support conclusion with substantial evidence:** ALJ Cofresi, in part, based his determination that Ms. Gutierrez was employable on his erroneous finding that she was literate and able to communicate in English.  Apparently, ALJ Cofresi came to this conclusion based on his own conviction that anyone who has lived in the United States for a period of years could communicate effectively in English.  He wholly ignored evidence that in fact, Ms. Gutierrez is unable to speak or communicate in English with any proficiency, a fact which should have been considered in his assessment of her residual functional capacity.

    e.      **Other errors:** ALJ Cofresi also demonstrated significant bias against Ms. Gutierrez for her immigrant status.  Beyond the improper application of the law with regard to her language skills, examples of harsh language directed at Ms. Gutierrez and skewed reasoning with regard to her immigrant status abound.  For example, although the elements of a disability claim relate only to claimant's medical condition, ALJ Cofresi questioned Ms. Gutierrez about her immigration history at length, going back more than 20 years, and asking for details about when she entered the United States and whether she had had a visa or had entered illegally.  Additionally, ALJ Cofresi went out of his way to use Ms. Gutierrez's immigration history to cast her in a negative light; although Ms. Gutierrez has been a legal

permanent resident throughout the application process, ALJ Cofresi described her as having

evaded and disregarded the law.  This entire line of questioning was irrelevant to her eligibility

for disability benefits and evidenced ALJ Cofresi's flagrant bias against claimant.  Also, by

ignoring the bulk of the evidence supporting disability, including the findings of four physicians

that Ms. Gutierrez is disabled, ALJ Cofresi also failed to apply the preponderance of the

evidence standard in rendering his decision.

### j)      **Plaintiff Julia Juan**

281.    Ms. Juan's case was heard by ALJ Nisnewitz.  ALJ Nisnewitz's decision,

denying benefits to Ms. Juan, was premised on several errors, including failure to abide by the

Treating Physician Rule, erroneous credibility determinations, and failure to support

conclusions with substantial evidence.

282.    **Background Facts**:  Julia Juan, born November 23, 1952, is a 58-year-old

resident of Elmhurst, New York.  Ms. Juan has been disabled since February 5, 2005, and has

not engaged in substantial gainful employment since that date.  She had previously worked as a

school kitchen helper.

283.    **Disabilities**:  Ms. Juan suffers from the following severe impairments:

lumbago,[5] diabetes, hypertension, obesity, arthritis, allergies and sinusitis.  Ms. Juan

experiences constant pain in her back and the side of her leg, as well as muscle spasms and

cramps in her toes.

284.    **Procedural History**:  Ms. Juan applied for SSD benefits on August 19, 2008,

and for SSI benefits on August 22, 2008.  These claims were both initially denied and a hearing

was held before ALJ Nisnewitz, who rendered a decision on September 30, 2009 finding Ms.

---

[5]  Lombago is a condition causing acute or chronic pain in the lower back.

Juan not eligible for benefits.  Ms. Juan requested review by the Appeals Council.  On

September 14, 2010, the Appeals Council found that ALJ Nisnewitz had failed to provide an

adequate rationale for the weight he assigned to the treating physicians' opinions.  The Appeals

Council remanded her case back to ALJ Nisnewitz, despite Ms. Juan's request to be heard

before a different ALJ, amounting, in effect, to a denial of a fair hearing.  In late March 2011,

Ms. Juan appealed ALJ Nisnewitz's second denial of benefits to the Appeals Council.

285.   **Errors**:  ALJ Nisnewitz's decision was premised on the following errors:

a.      **Treating Physician Rule:**  ALJ Nisnewitz wrongfully afforded more

weight to the opinion of the Commissioner's non-examining physician than to that of Ms.

Juan's treating physician and failed to provide his reasons for doing so.  ALJ Nisnewitz also

failed to explain why he chose to discount the three other medical opinions in the record which

assessed much more severe limitations than the single residual functional capacity assessment

that supported ALJ Nisnewitz's determination.

b.      **Erroneous credibility determination:**  ALJ Nisnewitz improperly

discounted Ms. Juan's testimony concerning the intensity, persistence, and limiting effects of

her symptoms, and applied incorrect legal standards.  At the hearing, Ms. Juan testified that she

could only stand for up to ten minutes and only walk for two blocks before becoming fatigued.

She also detailed constant pain in her back, leg, and toes, and stated that she experiences pain

when rising from the toilet.  ALJ Nisnewitz refused to believe Ms. Juan's testimony regarding

the pain she experienced.  He impermissibly cited her ability to engage in a reasonable range of

daily activities, such as personal care, cleaning, watching television, or playing solitaire, in his

conclusion that she was not disabled.  He also ignored supporting objective medical evidence

and distorted Ms. Juan's care for her grandson with help from a neighbor to support his theory that she lacked a disability.

        c.      **Failure to support conclusions with substantial evidence:**  ALJ Nisnewitz rejected Ms. Juan's testimony about the severity of her pain in part because her treatment has been "mostly conservative."  This was legal error as established precedent confirms that an ALJ cannot impose his own opinion of pain severity based on the course of medical treatment recommended.  ALJ Nisnewitz committed further error when he determined that Ms. Juan's depression is a non-severe impairment.  This finding ignored the medical records of several examining physicians who observed signs of depression in Ms. Juan sufficient to support a conclusive presumption that Ms. Juan is disabled.

        d.      **Other errors**:  By ignoring the bulk of the evidence supporting disability, ALJ Nisnewitz also failed to apply the preponderance of the evidence standard in rendering his decision.  Also, his conclusions about the severity of Ms. Juan's impairment and the "conservative" nature of her treatment reflected a substitution of his medical opinion for that of the physicians.

        k)      <u>**Plaintiff Jane Doe**</u>

286.    Ms. Doe's case was heard by ALJ Fier.  ALJ Fier's decision, denying benefits to Ms. Doe, was premised on several errors, including failure to honor a request for a representative, failure to develop the record, failure to properly apply the Treating Physician Rule and failure to support conclusions with substantial evidence.

287.    **Background Facts**:  Jane Doe is a 46-year-old woman who lives in Far Rockaway, New York.  She has worked as a housecleaner and babysitter, but she has not engaged in substantial gainful activity since 2002.  She receives public assistance.

288.   **Disabilities**:  Ms. Doe suffers from several disabling conditions, including major depressive disorder, panic disorder with agoraphobia, and obsessive-compulsive disorder.  Due to her mental illness, Ms. Doe has been exempted as unemployable from New York City's work requirements for recipients of public assistance.

289.   **Procedural History**:  In 2007, Ms. Doe filed an application for SSI benefits, which was denied.  Ms. Doe appealed and a hearing was held in 2009 before ALJ Fier at which Ms. Doe appeared *pro se*.  One month after the hearing, ALJ Fier rendered a decision finding Ms. Doe not disabled.  In late 2009, with the aid of counsel, Ms. Doe appealed ALJ Fier's decision to the Appeals Council.  Ms. Doe submitted additional evidence to the Appeals Council earlier this year.  Her request for review is still pending.

290.   **Errors**:  ALJ Fier's decision was premised on the following errors:

a.   **Failure to honor a request for a representative**:  Although regulations required ALJ Fier to ask Ms. Doe questions to ensure she understood her right to representation, ALJ Fier did not do so.  Instead, he opened the hearing by concluding that it was "evident" that Ms. Doe wished to proceed without representation.  When Ms. Doe *subsequently* asked if she should have an attorney, and indicated that an agency had offered her representation if given time to prepare, ALJ Fier did not offer an adjournment and conducted the hearing without any representation for Ms. Doe, who suffers from several mental impairments.

b.   **Failure to develop the record**:  ALJ Fier failed to develop the record – as was his duty – for Ms. Doe, a *pro se*, mentally ill claimant.  At the hearing, Ms. Doe testified that she had an emergency room visit in 2008 and that she was currently receiving mental health treatment.  Despite his mandate to do so, ALJ Fier made no attempt to obtain any related records regarding her hospital visit or treatment notes.  Additionally, during the hearing, he

asked no questions about the various medications prescribed to Ms. Doe nor did he enquire about Ms. Doe's depression, panic attacks, fears of leaving the house, or obsessive compulsive behaviors.

        c.      **Treating Physician Rule**: ALJ Fier failed to assign weight to numerous medical source statements about Ms. Doe's mental limitations.  Instead, he weighed the various medical source statements only as they apply to exertional levels of work, crediting an unnamed treating source and an unnamed consultative source for his finding that Ms. Doe can perform work at any exertional level.  At no point did he assign weight to the opinions in the record regarding mental limitations.

        d.      **Failure to support conclusion with substantial evidence**:  ALJ Fier failed to base his analysis of Ms. Doe's residual functional capacity assessment on all of the relevant evidence.  He ignored most of the extensive non-exertional limitations described in the record, improperly marginalizing her ailments and concluding, without proper basis, that she could perform "simple work not requiring too much interaction with others."

        e.      **Other errors:**  By ignoring the bulk of the evidence supporting disability, including the findings of four physicians that Mr. Doe is disabled, ALJ Fier also failed to apply the preponderance of the evidence standard in rendering his decision.

      \*      \*      \*

291.    It is quite clear that each of the plaintiffs has suffered from the same series of errors that this Court, time and time again, has been called upon to correct.  Absent action from this Court, Class Plaintiffs will be subjected to continuing bias from the Named ALJs' errors.

292.    In the meantime, the denial of SSI and SSD benefits is causing plaintiffs and other members of the class to endure severe deprivation and hardship.

**IRREPARABLE INJURY AND NO ADEQUATE REMEDY AT LAW**

293.     The Commissioner's failure to take adequate steps to prevent Chief ALJ

Nisnewitz, and ALJs Cofresi, Fier, Hoppenfeld, and Strauss from failing to provide fair

hearings, or from rendering decisions based on bias has led to the wrongful denial of benefits to

plaintiffs and class members and has caused them severe deprivation and hardship, which is

irreparable injury.

294.     Plaintiffs and class members have no adequate remedy at law.

**COUNT I –SOCIAL SECURITY ACT –**

**42 U.S.C. §§ 405(b)(1) AND 1383(c)(1)**

295.     Plaintiffs repeat and reallege Paragraphs 1 through 294, as if fully set forth

herein.

296.     As a result of the bias of Chief ALJ Nisnewitz and ALJs Cofresi, Fier,

Hoppenfeld, and Strauss against claimants for disability benefits, and their failure to follow

applicable law and applicable instructions from the Appeals Council and the federal district

courts, plaintiffs and members of the plaintiff class have been denied fair hearings before an

impartial adjudicator in violation of the Social Security Act, 42 U.S.C. §§ 405(b)(1) and

1383(c)(1).

**COUNT II –ADMINISTRATIVE PROCEDURE ACT –**

**5 U.S.C. § 556(b)**

297.     Plaintiffs repeat and reallege Paragraphs 1 through 296, as if fully set forth

herein.

298.     As a result of the bias of Chief ALJ Nisnewitz and ALJs Cofresi, Fier,

Hoppenfeld, and Strauss against claimants for disability benefits, and their failure to follow

applicable law and applicable instructions from the Appeals Council and the federal district courts, plaintiffs and members of the plaintiff class have been denied fair hearings before an impartial adjudicator in violation of the Administrative Procedure Act, 5 U.S.C. § 556(b).

## COUNT III – THE NAMED ALJs VIOLATED THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION

299.    Plaintiffs repeat and reallege Paragraphs 1 through 298, as if fully set forth herein.

300.    As a result of the bias of Chief ALJ Nisnewitz and ALJs Cofresi, Fier, Hoppenfeld, and Strauss against claimants for disability benefits, and failure to follow applicable law and applicable instructions from the Appeals Council and the courts, plaintiffs have been and will be denied fair hearings before an impartial adjudicator, in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution.

## COUNT IV – COMMISSIONER VIOLATED THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION

301.    Plaintiffs repeat and reallege Paragraphs 1 through 300, as if fully set forth herein.

302.    Defendant is, or should be, aware of the bias and other improper conduct of Chief ALJ Nisnewitz and ALJs Cofresi, Fier, Hoppenfeld, and Strauss, but has failed to take adequate steps to eliminate the harm that their bias and improper conduct is causing to claimants for disability benefits, in violation of the Social Security Act and the Due Process Clause of the Fifth Amendment.

## COUNT V – THE NAMED ALJS' DECISIONS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND ARE CONTRARY TO LAW – 42 U.S.C. §§ 405(g) AND 1383(c)(3)

303.    Plaintiffs repeat and reallege Paragraphs 1 through 302, as if fully set forth herein.

304.    The decisions in the individual named plaintiffs' claims are a product of the bias of Chief ALJ Nisnewitz and ALJs Cofresi, Fier, Hoppenfeld, or Strauss, are not supported by substantial evidence and are contrary to law.  42 U.S.C §§ 405(g) and 1383(c)(3).

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that this Court:

1.    Certify this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

2.    Grant expedited discovery under 42 U.S.C. § 405(g);

3.    Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that Chief ALJ Nisnewitz and ALJs Cofresi, Fier, Hoppenfeld, and Strauss:  (a) are generally biased against claimants for disability benefits under the Social Security Act; (b) routinely fail to develop administrative records in dereliction of their duties; (c) routinely refuse to apply correct legal standards even when instructed by federal courts or the Appeals Council to do so; (d) routinely make erroneous credibility determinations against claimants, including by failing to consider claimants' work histories; (e) routinely engage in adversarial, unprofessional, and unfair behavior to the detriment of claimants; and (f) that Chief ALJ Nisnewitz and ALJs Cofresi, Fier, Hoppenfeld, and Strauss's conduct deprived Class Plaintiffs of their right to a fair hearing before an impartial

adjudicator, in violation of the Social Security Act, the Administrative Procedure Act, and the Due Process Clause of the Fifth Amendment to the United States Constitution;

4.      Enter a permanent injunction prohibiting the Commissioner from allowing the Named ALJs to preside over any claims for SSI or SSD benefits;

5.      Enter a permanent injunction ordering defendant to:

a.      Provide plaintiffs and class members who have received an unfavorable decision from the Named ALJs during the Class Period with the opportunity for new hearings before Administrative Law Judges other than the Named ALJs;

b.      In the event that the Named ALJs continue hearing disability claims, provide them with retraining to ensure that future decisions of the Named ALJs are not tainted by generalized bias; and

c.      In the event that the Named ALJs continue hearing disability claims, develop a system to monitor any future decisions of the Named ALJs to ensure that they are not tainted by generalized bias.

6.      Order the Commissioner to notify plaintiff class members of the determination of this Court and of their right to new hearings on their Social Security Act claims.

7.      Annul the decision denying benefits or partially denying benefits in each of the Class Plaintiffs' claims and remand them to the Commissioner for new hearings or for the award of benefits before an Administrative Law Judge other than the Named ALJs.

8.      Award plaintiffs attorneys' fees, costs and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412(a) and (d) or any successor legislation.

9.      Grant such other relief as the Court may deem just and proper.

Dated:   New York, New York
           May 4, 2011

GIBSON, DUNN & CRUTCHER LLP

By: _____

Jim Walden (JW-0447)
Oliver M. Olanoff (OO-0209)
Matthew Menendez (MM-2685)
Tyler H. Amass (TA-7742)
Sharon I. Grysman (SG-2383)

200 Park Avenue, 50th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

URBAN JUSTICE CENTER

Ian F. Feldman (IF-9140)
Emilia Sicilia (ES-1215)

123 William Street, 16th Floor
New York, New York 10038
Telephone: 646.602.5668
Facsimile: 212.533.4598

*Attorneys for Plaintiffs*